SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

### Roy Steinberg, Ph.D. v. Sahara Sam's Oasis, LLC (A-41-14) (075294)

**Argued February 29, 2016 -- Decided August 23, 2016**

**ALBIN, J., writing for a unanimous Court.**

In this appeal, the primary issue is whether, under the statutory and regulatory provisions of the Carnival-Amusement Rides Safety Act (the Safety Act), N.J.S.A. 5:3-31 to -59, the evidence in the summary judgment record supports an action for gross negligence.

On April 4, 2010, plaintiff was a patron at Sahara Sam's Oasis Water Park. One of the indoor rides at the water park, the FlowRider, simulates riding a surfboard. A participant can lie prone on a bodyboard or stand on a "flowboard," which resembles a small surfboard. When a rider is in a standing position, an attendant holds one end of a rope and offers the other end to the rider to assist with balance as he simulates surfing. Plaintiff gained admission to the ride after he signed a form acknowledging the risks associated with using the FlowRider and waiving liability for any injury caused by the negligence or other actions of Sahara Sam's or its employees. According to plaintiff, the attendants did not tell him that, as a first-time rider, he should lie on his stomach on the bodyboard or, if standing on the flowboard, he should not hold the rope with two hands. Plaintiff stepped onto the flowboard and, while standing, an attendant handed him a rope, which plaintiff wrapped around one hand and held in the other. The flowboard was then released into the water. Within seconds, plaintiff fell from the board head-first, striking his head on the bottom surface, which caused a spinal cord injury. The injury rendered plaintiff an incomplete paraplegic.

Sahara Sam's contracted with Aquatic Development Group (ADG) for the purchase and installation of the FlowRider, which was manufactured by Wave Loch, Inc. and ADG. To comply with the Safety Act, ADG submitted the ride's blueprints and the manufacturer's 2007 operator's manual, which included recommended safety signage, for review to the New Jersey Department of Community Affairs, Amusement Safety Ride Unit (DCA). Based on the information received from ADG, the DCA granted type certification in July 2008. Before the FlowRider went into operation, Sahara Sam's received the updated 2008 manufacturer's manual, which provided for new signage with pictorial displays and more explicit safety-warning language. At the time of plaintiff's accident in 2010, the signage from the 2007 manual, not the 2008 manual, was on display. The differences between the signage in use and the signage that should have been installed is an essential component of plaintiff's case because he claims he was not placed on notice of the gravity of the danger and the precautions he should have taken to avoid injury.

In February 2009, one month before the FlowRider opened to the public, Wave Loch's corporate designee for training, Robert Chalfant, instructed Sahara Sam's employees on the safe operation of the ride using the 2008 manual. Chalfant told those in attendance that a first-time rider should lie in a prone position. Nevertheless, according to Sahara Sam's Aquatic Director, operators of the FlowRider did not advise first-time riders to lie in the prone position. Chalfant also instructed employees that a rider should not wrap the balance rope around his wrists or hold the rope with two hands because doing so would expose the rider to a greater risk of injury. According to Chalfant, the 2008 recommended signage should have been in place at the time the ride opened to the public.

The trial court granted summary judgment in favor of Sahara Sam's, dismissing plaintiff's civil action. The court held that, before his admission to the ride, plaintiff signed a general waiver of liability that extinguished his right to file a negligence action and any action arising under the Safety Act. The court also held that the summary-judgment record did not support an action for gross negligence. In an unpublished opinion, a three-judge Appellate Division panel, in a split decision, affirmed the trial court's grant of summary judgment. The panel determined that plaintiff entered into a valid recreational exculpatory agreement in which he agreed to waive any liability claim arising from injuries suffered while participating in the FlowRider. Although it acknowledged that the waiver agreement could not exonerate gross negligence, the panel rejected plaintiff's argument that a reasonable jury could find that Sahara Sam's actions constituted gross negligence. In his dissenting opinion, Judge Hoffman asserted that the panel majority erred by not viewing the evidence in the light most favorable to plaintiff on the gross-negligence claim and detailed the facts in the record, which, if believed by a reasonable factfinder, would constitute gross negligence.

Based on the dissent in the Appellate Division, plaintiff appealed as of right the issue of whether the summary-judgment record presented a genuine issue of material fact on his claim of gross negligence. The Court also granted plaintiff's petition for certification on the issue of whether Sahara Sam's alleged violation of the Safety Act, standing alone, precludes enforcement of the waiver and constitutes an independent basis for reversal of the trial court's grant of summary judgment. 220 N.J. 575 (2015).

**HELD:** The summary-judgment record, viewed in the light most favorable to plaintiff, would allow a reasonable finder

of fact to conclude that plaintiff's injuries were caused by Sahara Sam's gross negligence. Further, while a violation of the Safety Act, standing alone, does not give rise to a private cause of action, particular violations of the Safety Act, individually or in their aggregate, may be considered as evidence in determining whether Sahara Sam's acted with gross negligence.

1. Plaintiff concedes that the liability-waiver agreement he signed before participating in the FlowRider bars his negligence claim. Instead, he argues that Sahara Sam's is accountable for its statutory violations of the Safety Act and its gross negligence, which were the proximate cause of the injuries. The Court addresses only those claims raised by plaintiff that are not barred by the waiver agreement. The Court rejects plaintiff's implied argument that a violation of the Safety Act, standing alone, gives rise to a private right of action. The Safety Act and its accompanying regulations set forth an administrative framework for ensuring the safety of those attending carnivals and amusement parks, including water parks, in New Jersey. The DCA is charged with the responsibility of enforcing the Safety Act and its regulations. The Safety Act provides for administrative sanctions against the operator of a carnival or amusement park for violating the statutory or regulatory scheme. It does not give rise to a private cause of action or a tort-liability scheme, but articulates legislative and regulatory standards of conduct intended to protect members of the public who patronize amusement parks. Violations of those standards may be considered as evidence of negligence, or even gross negligence, in a common-law cause of action. (pp. 18-21)

2. Certain regulations promulgated under the Safety Act are intended to inform and protect patrons using water park rides. For example, a water-ride operator must post signs required or recommended by the ride manufacturer. The owner must train operators of the ride based on manufacturer requirements covered by the operational manual. Here, for example, the owner of Sahara Sam's did not post the signs recommended in the manufacturer's 2008 operator's manual. If Sahara Sam's failed to post the signage as required by the Safety Act, then a jury may consider that failure as evidence of negligence, provided that there is a showing that the violation is relevant to the accident. In sum, in certain circumstances, the violation of a statutory duty of care may be admissible as evidence of negligence. In this case such evidence is permissible because the aggregation of alleged negligent acts or omissions may be considered in determining whether Sahara Sam's conduct reached the level of gross negligence. (pp. 22-23)

3. The principal issue in this appeal is whether the record, when viewed in the light most favorable to plaintiff, supported the trial court's grant of summary judgment dismissing plaintiff's claim of gross negligence. Gross negligence falls on a continuum between ordinary negligence and recklessness. Negligence is defined generally as the failure to exercise that degree of care for the safety of others, which a person of ordinary prudence would exercise under similar circumstances. Gross negligence is a higher degree of negligence. While negligence is the failure to exercise ordinary or reasonable care that leads to a natural and probable injury, gross negligence is the failure to exercise slight care or diligence. Although gross negligence is something more than inattention or mistaken judgment, it does not require willful or wanton misconduct or recklessness. The Court endorses the definition of gross negligence found in the New Jersey Civil Model Jury Charge and rejects the trial court's and appellate panel majority's description of gross negligence as the equivalent of willful conduct. Negligence, gross negligence, recklessness, and willful conduct fall on a spectrum, and the difference between negligence and gross negligence is a matter of degree. (pp. 24-28)

4. On a motion for summary judgment, the strength of Sahara Sam's case is not at issue. At this procedural stage, the Court must simply view the record in the light most favorable to plaintiff and resolve whether, on that basis, a reasonable factfinder could find that plaintiff's injuries were proximately caused by the gross negligence of Sahara Sam's. Based on that standard, the Court agrees with the dissent in the Appellate Division that the trial court erred in granting summary judgment. The FlowRider is an extreme sport and high-risk recreational activity that simulates surfing. Nevertheless, at the time that plaintiff participated in the ride, Sahara Sam's did not post the updated signage recommended by the manufacturer. The factfinder is permitted to draw inferences from Sahara Sam's failure to follow the manufacturer's recommendations and to consider as evidence of negligence the failure to comply with safety regulations promulgated under the Safety Act. The issue is not whether Sahara Sam's failed to exercise reasonable care in any one instance. Rather, it is whether viewing the entire tableau in the light most favorable to plaintiff, a factfinder could conclude that by not implementing the safety features in the 2008 operator's manual and not giving plaintiff the necessary safety instructions, Sahara Sam's failed to exercise slight care or diligence or demonstrated an extreme departure from the standard of reasonable care. Viewed in that light, a rational factfinder could conclude that the proximate cause of plaintiff's injuries was the gross negligence of Sahara Sam's. (pp. 28-32)

The judgment of the Appellate Division, which affirmed the trial court's grant of summary judgment, is **REVERSED.** The gross-negligence claim is **REINSTATED** and the matter is **REMANDED** to the trial court for proceedings consistent with this opinion.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE ALBIN's opinion.**

ROY STEINBERG, Ph.D. and TAMI
BOGUTZ STEINBERG, h/w,

     Plaintiffs-Appellants,

         v.

SAHARA SAM'S OASIS, LLC,
a/k/a SAHARA SAM'S, LLC,

     Defendant-Respondent,

     and

WAVE LOCH, INC., AQUATIC
DEVELOPMENT GROUP, INC., ITT
WATER & WASTEWATER, ITT
CORPORATION, ITT FLYGT
CORPORATION, SAMBE
CONSTRUCTION COMPANY, INC.,
SAMBE CONSTRUCTION CO., INC.,
AQUATIC BUILDERS LTD., H20
ENTERTAINMENT GROUP, LLC, and
HYDROTECH SYSTEMS, LTD.,

     Defendants.

Argued February 29, 2016 – Decided August 23, 2016

On appeal from and certification to the
Superior Court, Appellate Division.

Barry J. Muller argued the cause for
appellants (Fox Rothschild, attorneys; Mr.
Muller and Jonathan D. Weiner, of counsel,
and on the briefs).

Laura M. Danks argued the cause for
respondent (Capehart & Scatchard, attorneys;
Ms. Danks and Christopher J. Hoare, on the
briefs).

Lary I. Zucker and Walter F. Kawalec, III, submitted a brief on behalf of amici curiae World Waterpark Association and New Jersey Amusement Association (Marshall Dennehey Warner Coleman & Goggin, attorneys).

E. Drew Britcher and Kristen B. Miller submitted a brief on behalf of amicus curiae New Jersey Association for Justice (Britcher, Leone & Roth, attorneys).

JUSTICE ALBIN delivered the opinion of the Court.

While a patron at defendant Sahara Sam's Oasis Water Park, plaintiff Roy Steinberg suffered a catastrophic spinal cord injury while participating in a water ride that simulated riding a surfboard. Plaintiff filed a lawsuit against Sahara Sam's Oasis, LLC, alleging that his injuries were caused by its gross negligence and violations of statutory and regulatory provisions of the Carnival-Amusement Rides Safety Act (the Safety Act), N.J.S.A. 5:3-31 to -59. Plaintiff claims that Sahara Sam's failed to post safety signage that warned of the ride's dangers, to instruct him on how to safely ride the simulated surfboard, to properly train its employees on safety procedures concerning the ride, and to comply with the mandates of the Safety Act.

The trial court granted summary judgment in favor of Sahara Sam's, dismissing plaintiff's civil action. The court held that, before his admission to the ride, plaintiff signed a general waiver of liability that extinguished his right to file a negligence action and any action arising under the Safety Act.

2

The court also held that the summary-judgment record did not support an action for gross negligence. A three-judge panel of the Appellate Division affirmed in a split decision. The dissenting judge concluded that the evidence, when viewed in the light most favorable to plaintiff, provided sufficient support for a gross-negligence action.

We agree with the dissenting Appellate Division judge that the summary-judgment record, viewed in the light most favorable to plaintiff, would allow a reasonable finder of fact to conclude that plaintiff's injuries were caused by Sahara Sam's gross negligence. Stated differently, if a reasonable factfinder believed that Sahara Sam's acts and omissions demonstrated its failure to exercise the slightest degree of care or an extreme departure from the standard of reasonable care, then a verdict of gross negligence could be returned.

We also hold that a violation of the Safety Act, standing alone, does not give rise to a private cause of action. Particular violations of the Safety Act, individually or in their aggregate, however, may be considered as evidence in determining whether Sahara Sam's acted with gross negligence.

We therefore vacate the trial court's grant of summary judgment, reinstate plaintiff's gross-negligence action, and remand to the trial court for proceedings consistent with this opinion.

I.

Plaintiff filed a civil action in the Superior Court, Law Division, alleging that he suffered a catastrophic spinal cord injury as a proximate result of the negligence, gross negligence, and recklessness of Sahara Sam's.[1] Plaintiff's wife, Tami Bogutz-Steinberg,[2] filed a consortium claim. Both are seeking monetary damages.

Sahara Sam's moved for summary judgment. The trial court granted the motion and dismissed plaintiff's complaint, and the Appellate Division affirmed. "In reviewing a grant of summary judgment, 'we apply the same standard governing the trial court -- we view the evidence in the light most favorable to the non-moving party.'" Qian v. Toll Bros. Inc., 223 N.J. 124, 134-35 (2015) (quoting Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012)). Because plaintiff is the non-moving party, we present the evidence from the summary-judgment record in the light most favorable to his case.

---

[1] Plaintiff also named as defendants Wave Loch, Inc., Aquatic Development Group, Inc., ITT Water & Wastewater, ITT Corp., ITT Flygt Corp., Sambe Construction Co., Inc., Aquatic Builders Ltd., H2O Entertainment Group, LLC, and Hydrotech Systems, Ltd., who are alleged to have caused plaintiff's injuries based on a variety of legal theories. Those defendants are not parties to this appeal.

[2] Although Roy Steinberg and his wife are both plaintiffs, for the convenience of the reader, we refer to Mr. Steinberg as plaintiff throughout this opinion.

4

A.

On April 4, 2010, plaintiff and his two children were patrons at Sahara Sam's Oasis Water Park, which is located in Berlin Township, Camden County. One of the indoor rides at the water park is called the FlowRider, which simulates riding a surfboard. A participant can either lie prone on a bodyboard or stand on a "flowboard," which resembles a small surfboard. The flowboard, if chosen, is placed on a sheet of water, two-and-one-half to three inches deep, flowing toward the rider like an oncoming wave. When a rider is in a standing position, an attendant holds one end of a rope and offers the other end to the rider to assist with balance as he simulates surfing.

Plaintiff gained admission to the ride after he signed a form both acknowledging the risks associated with using the FlowRider and waiving liability for any injury caused by the negligence or other actions of Sahara Sam's or its employees. According to plaintiff, the attendants did not tell him that, as a first-time rider, he should lie on his stomach on the bodyboard or, if standing on the flowboard, he should not hold the rope with two hands. In short, plaintiff claims he was given minimal instruction before undertaking the ride.

Plaintiff stepped onto the flowboard and, while standing, an attendant handed him a rope, which plaintiff wrapped around

5

one hand and held in the other.[3]  The flowboard was then released

into the water.  Within seconds, plaintiff fell from the board

head-first, striking his head on the bottom surface, which

caused a spinal cord injury.  The injury rendered plaintiff an

"incomplete paraplegic."[4]

B.

Sahara Sam's contracted with Aquatic Development Group

(ADG) for the purchase and installation of the FlowRider, which

was manufactured by Wave Loch, Inc. and ADG.  To comply with the

Safety Act, ADG submitted the ride's blueprints and the

manufacturer's 2007 operator's manual, which included

recommended safety signage, for review to the New Jersey

Department of Community Affairs, Amusement Safety Ride Unit

(DCA).  The purpose of the submissions was to secure type

certification, which is a precondition for the operation of the

ride and "all rides of essentially the same design."  N.J.S.A.

5:3-32(j).  Based on the information received from ADG, the DCA

---

[3] According to the lifeguard on duty, after plaintiff wrapped the rope around his hand, he instructed plaintiff not to do so, and plaintiff then unwrapped the rope.

[4] We find that, based on a review of the videotape of the accident, there is a genuine issue of material fact concerning whether plaintiff held the rope with one or two hands.  However, viewing the videotape in the light most favorable to plaintiff, as we must at this stage, we determine that a reasonable jury could conclude that plaintiff held the rope with two hands.

6

granted type certification in July 2008.[5]  The FlowRider's installation was completed in February 2009.

Before the FlowRider went into operation, Sahara Sam's received the updated 2008 manufacturer's manual, which provided for new signage with pictorial displays and more explicit safety-warning language.[6]  Nevertheless, at the time of plaintiff's accident in 2010, the signage from the 2007 manual, not the 2008 manual, was on display.  The differences between the signage in use and the signage that should have been installed is an essential component of plaintiff's case because plaintiff claims he was not placed on notice of the gravity of the danger and the precautions he should have taken to avoid injury.

The 2007 FlowRider signage provided:  "PARTICIPATION ON THIS RIDE AND CONSENT OF WAIVER INDICATES YOU UNDERSTAND THE POTENTIAL TO GET INJURED SHOULD YOU FALL WHILE PARTICIPATING." (Emphasis added).  The 2008 recommended signage provided: "RIDING THE FLOWRIDER IS AN EXTREME SPORT AND HIGH RISK RECREATIONAL ACTIVITY.  YOU WILL FALL."  (Emphasis added).

The 2007 signage provided:  "Pregnant women and persons with or having a history of heart, back, neck, shoulder or joint

---

[5] The type certification was good for three years.

[6] Neither ADG nor Wave Loch submitted the 2008 manufacturer's operator's manual to the DCA for Sahara Sam's FlowRider.

problems should not ride."  (Emphasis added).  The 2008 recommended signage provided:  "If you suspect that your health or safety could be at risk, or you could aggravate a pre-existing condition of any kind, DO NOT RIDE!"  (Emphasis added).

The 2007 signage provided:  "THIS IS AN EXTREME WATER ATTRACTION . . . .  BODY MUSCLES AND BONES COULD SUSTAIN INJURY. . . .  SAHARA SAM'S IS STRESSING THE POTENTIAL FOR INJURY ON THIS ATTRACTION IN ADVANCE OF YOUR PARTICIPATION."  (Emphasis added).  In addition, the waiver form signed by plaintiff stated that "[a]lthough many before you have ridden the FlowRider without any problem whatsoever, injuries are possible because of the nature of the ride."  (Emphasis added).  The 2008 recommended signage provided:  "FAILURE TO COMPLY WITH SIGNS OR INSTRUCTIONS MAY INCREASE THE RISK OF SEVERE PERMANENT INJURIES OR EVEN DEATH."  (Emphasis added).

The 2008 recommended signage also displayed warnings for which there were no equivalent warnings in the 2007 signage. For example, the 2008 recommended signage instructed participants that "FALLING MAY RESULT IN THE BOARD STRIKING YOUR BODY; OR YOUR BODY STRIKING THE SURFACE OF THE FLOWRIDER WITH GREAT FORCE" and that "BEFORE ATTEMPTING TO RIDE, WATCH THE SAFETY VIDEO AND UNDERSTAND THE RISKS OF THIS ACTIVITY."  (Emphasis added).

8

Unlike the 2007 signage, the 2008 recommended signage contains drawings that illustrate the dangers of riding a flowboard and safety techniques for the rider. One picture shows a rider falling from a flowboard, another a rider striking his head on the board and a hard surface, and yet another a rider curling in a ball and covering his head with his arms to protect against injury. Other pictures show the proper manner to ride a flowboard.

In February 2009, one month before the FlowRider opened to the public, Wave Loch's corporate designee for training, Robert Chalfant, instructed Sahara Sam's employees on the safe operation of the ride using the 2008 manual. Chalfant told those in attendance that a first-time rider should lie in a prone position -- flat on his stomach.[7] As part of learning to ride the FlowRider, Sahara Sam's Aquatic Director, Brandon Moore, rode for the first time in the prone position. Nevertheless, according to Moore, operators of the FlowRider did not advise first-time riders to lie in the prone position. Chalfant also instructed employees that a rider should not wrap the balance rope around his wrists or hold the rope with two hands because doing so would expose the rider to a greater risk

---

[7] At his deposition, Chalfant identified the 2008 manual as the one he used while instructing Sahara Sam's employees. Sahara Sam's takes the position that it never received the 2008 manual.

9

of injury.  According to Chalfant, the 2008 recommended signage should have been in place at the time the ride opened to the public.

Sahara Sam's received a safety video referenced in the 2008 manual.  Lifeguards who were not present at the February 2009 training, however, were not shown this video, and the video referenced in the 2008 recommended signage was not made available to users of the FlowRider.  Sahara Sam's owner, Ilya Girlya, admitted during his deposition that the water park did not have written safety training protocols and that his staff was not required to read the operator's manual or any equivalent materials.[8]

According to plaintiff's deposition testimony, he received very little instruction on how to ride the flowboard and did not receive the new-rider orientation suggested by the 2007 and 2008 manuals.  Plaintiff admittedly signed the waiver form without reading it and did not pay attention to the warnings on the signs.  According to the attendant, the instructions given to plaintiff about the FlowRider lasted less than a minute.  The attendant, moreover, did not specifically warn plaintiff about the risks associated with the ride or, in keeping with the 2008

---

[8] Four months before plaintiff's accident, the DCA inspected the FlowRider -- based on the 2007 operator's manual -- and did not find any violations.

10

manual, caution him that severe permanent injuries or even death could result from the failure to follow instructions. Plaintiff indicated that the attendant did not assess plaintiff's level of experience with the FlowRider or tell him that a first-time rider should lie in the prone position.[9] Plaintiff also stated that the attendant did not tell him how to use the rope or warn against holding the rope with two hands. Had the updated signage been in place or had he been told that he could be severely injured while riding the flowboard, plaintiff maintained he would not have participated in the FlowRider. Sahara Sam's Aquatic Director reported the accident to the DCA the same day that it occurred. According to Sahara Sam's owner, the next day a DCA inspector checked the FlowRider and gave approval for the ride to remain open.

## C.

The trial court granted defendant's summary-judgment motion and dismissed plaintiff's action against Sahara Sam's.[10] The court found that, as a precondition to his participation in the FlowRider, plaintiff agreed in writing to waive his right to

---

[9] The lifeguard on duty testified that he asked plaintiff whether it was plaintiff's first time riding, and that plaintiff told him he was choosing to ride in a standing position because he was an experienced snowboarder.

[10] The trial court denied the summary-judgment motions of defendants H20 Entertainment Group, LLC and Sambe Construction Co., Inc.

11

seek damages from Sahara Sam's in the event he suffered injuries during the ride. The court determined that under Stelluti v. Casapenn Enterprises, LLC, 203 N.J. 286, 304 (2010), plaintiff entered into a valid waiver and therefore his negligence and statutory-violation claims were barred. The court recognized that, under Stelluti, the waiver did not extinguish a potential gross-negligence claim. The court, nevertheless, determined that, even if Sahara Sam's committed negligent acts, those acts did not rise "to the level of the willful conduct that is defined by our courts as gross negligence."

Plaintiff appealed.

D.

In an unpublished opinion, a three-judge Appellate Division panel, in a split decision, affirmed the trial court's grant of summary judgment. The panel determined that plaintiff entered into a valid "recreational exculpatory agreement" in which he agreed to waive any liability claim arising from injuries suffered while participating in the FlowRider. The panel, evidently, found that the waiver agreement barred plaintiff's negligence claim.

Without regard to the waiver agreement, the panel concluded that plaintiff did not present sufficient evidence that Sahara Sam's violated any statutory provision of the Safety Act or any of the accompanying regulations. The panel reasoned that the

12

DCA approved the 2007 manual and safety signage by granting type certification for the FlowRider for a period of three years and therefore "Sahara Sam's was in full compliance with the DCA certification." The panel noted that neither ADG nor Wave Loch submitted the updated 2008 manual and signage to the DCA to amend the type certification, as required by regulation. On that basis, the panel declined to impose on Sahara Sam's the obligation to comply with the manufacturer's 2008 operator's manual and the recommended 2008 safety signs.

Although it acknowledged that the waiver agreement could not exonerate gross negligence, the panel nevertheless rejected plaintiff's argument that a reasonable jury could find that Sahara Sam's actions constituted gross negligence. The panel stated that "the motion judge did not err in characterizing gross negligence as the equivalent of willful conduct." The panel maintained that, viewing the record in the light most favorable to plaintiff, the evidence did not raise a genuinely disputed issue of material fact that Sahara Sam's operation of the FlowRider constituted anything more than simple negligence.

In his dissenting opinion, Judge Hoffman asserted that the panel majority erred by not viewing the evidence in the light most favorable to plaintiff on the gross-negligence claim. Judge Hoffman detailed the facts in the record, which, if believed by a reasonable factfinder, would constitute gross

negligence.  Judge Hoffman also disagreed with the trial court and the panel majority that gross negligence requires willful conduct, citing to the Model Civil Jury Charge for gross negligence, which states that "[g]ross negligence . . . is more than ordinary negligence, but less than willful or intentional misconduct," Model Jury Charge (Civil) § 5.12 "Gross Negligence" (2009) (emphasis added).

Unlike the panel majority, Judge Hoffman concluded that Sahara Sam's had a duty to comply with the signage requirements of the 2008 manual and that ADG's failure to forward a copy of the updated manual to the DCA did not absolve Sahara Sam's of its obligation, under both the Safety Act's regulations and the common law.  According to the dissent, "Sahara Sam's common law tort liability establishes a distinct duty of care owed to its patrons, and the Safety Act does not supersede that duty of care."  Last, Judge Hoffman concluded that "Sahara Sam's violation of numerous safety and operation instructions of the manufacturer, which in turn constituted regulatory violations, provided sufficient evidence to present a jury question" on gross negligence.

### E.

Based on the dissent in the Appellate Division, plaintiff appealed as of right the issue of whether the summary-judgment record presented a genuine issue of material fact on his claim

14

of gross negligence.  See R. 2:2-1(a)(2).  We also granted plaintiff's petition for certification on the issue of whether Sahara Sam's alleged violation of the Safety Act, standing alone, "precludes enforcement of the Waiver and constitutes an independent basis for reversal of the trial court's grant of summary judgment."  See Steinberg v. Sahara Sam's Oasis, LLC, 220 N.J. 575 (2015).

Additionally, we granted the motions of the New Jersey Association of Justice (NJAJ) and World Waterpark Association and New Jersey Amusement Association (collectively World Waterpark and Amusement Associations) to appear as amici curiae.

II.

The parties agree that the waiver signed by plaintiff before participating in the FlowRider bars him from pursuing a negligence claim against Sahara Sam's.  They also apparently agree that the waiver is unenforceable against a claim alleging gross negligence or a claim alleging the breach of a duty imposed by statute.  See Stelluti, supra, 203 N.J. at 303, 313.

With those stipulations in mind, we now turn to the arguments of the parties.

A.

Plaintiff contends that the record contains sufficient evidence, when viewed in the light most favorable to him, to support a claim of gross negligence against Sahara Sam's.  To

15

buttress this contention, he points to (1) Sahara Sam's failure to post the signs with graphics recommended in the 2008 operator's manual, warning of the potential risk of severe permanent injury or death from a mishap on the FlowRider; (2) the failure of staff to recommend that he lie in the prone position for his first ride; and (3) the failure of the attendant to instruct him to release the rope when he fell from the flowboard.

Plaintiff also argues that the trial court mistakenly defined gross negligence as the equivalent of willful conduct. He asserts that the proper standard was whether Sahara Sam's failed to exercise the slightest degree of care or diligence in its operation of the FlowRider.

Plaintiff maintains that, because of the high degree of risk posed by the FlowRider, Sahara Sam's failure to abide by the Safety Act's requirements and the manufacturer's recommendations presents a genuine issue of material fact that Sahara Sam's conduct constituted gross negligence. Plaintiff, moreover, implicitly suggests that violations of the Safety Act give rise to an independent cause of action.

Amicus NJAJ submits that the liability waiver form signed by plaintiff is an unenforceable exculpatory agreement because it is contrary to public policy. But, as earlier explained, the waiver is not at issue in this case.

B.

Sahara Sam's argues that the record is devoid of evidence of gross negligence or a Safety Act violation concerning the operation of the FlowRider and therefore the Appellate Division properly affirmed the grant of summary judgment. Sahara Sam's insists that the differences in signage recommended in the 2007 and 2008 manuals were slight. It also notes that the manufacturer of the FlowRider inspected and approved of the 2007 signage in place at the time of the accident and that the DCA did not find any violations of the Safety Act after receiving a report of the accident. It further contends that the record does not establish proximate cause between an act or omission by Sahara Sam's and the injuries suffered by plaintiff.

Sahara Sam's states that plaintiff was aware that the FlowRider was a high-risk recreational activity, having witnessed participants fall before he set foot on the flowboard, and that plaintiff's admission that he did not read the warnings on the waiver form or on the posted 2007 signs establishes that the 2008 signs would not have stopped him from going on the ride. It also stresses that neither the 2007 nor the 2008 manual required that first-time riders lie in a prone position or required the use of an orientation video. Sahara Sam's, moreover, maintains that a review of the video of the accident belies plaintiff's claim that he rode the flowboard with the

17

rope wrapped around his wrist and that, even if an attendant did not adequately instruct him on the proper use of the rope, such a singular mistake would not evidence gross negligence because plaintiff released the rope before he fell. Finally, Sahara Sam's states that the trial court and appellate panel properly equated gross negligence with willful conduct.

Amici World Waterpark and Amusement Associations essentially argue that the Legislature intended the DCA, through its enforcement of the Safety Act, to have the principal responsibility in ensuring the safety of water-amusement rides and that the present lawsuit represents an encroachment into an exclusive executive-branch function. According to amici, the DCA exercised its responsibility by issuing type certification to Sahara Sam's, and, if permitted to proceed, the present lawsuit would "upend the statutory scheme in place."

### III.

Plaintiff concedes that the liability-waiver agreement he signed before participating in the FlowRider bars his negligence claim. See Stelluti, supra, 203 N.J. at 305, 313. Instead, he argues that Sahara Sam's is accountable for its statutory violations of the Safety Act and its gross negligence, which were the proximate cause of the injuries that rendered him an incomplete paraplegic.

18

A liability waiver -- a pre-injury release -- in a consumer agreement that exculpates a business owner from liability for tortious conduct resulting from the violation of a duty imposed by statute or from gross negligence is contrary to public policy and unenforceable.  Id. at 303, 313 (noting that business owner cannot, through waiver-of-liability agreement, contract away duty imposed by statute or exculpate itself for acts that constitute recklessness or gross negligence).  Therefore, we now turn to those claims raised by plaintiff that are not barred by the waiver agreement.

A.

We reject plaintiff's implied argument that a violation of the Carnival-Amusement Rides Safety Act (the Safety Act), N.J.S.A. 5:3-31 to -59, standing alone, gives rise to a private right of action.[11]  The Safety Act and its accompanying regulations set forth an administrative framework for ensuring the safety of those attending carnivals and amusement parks, including water parks, in New Jersey.  The DCA is charged with the responsibility of enforcing the Safety Act and the regulations promulgated pursuant to the Act.  N.J.S.A. 5:3-38.

_____

[11] N.J.S.A. 5:3-57(a) states that, "[a]s a precondition to bringing any suit in connection with an injury against an amusement park operator, a rider shall report in writing to the amusement park operator all the details of any accident within 90 days from the time of the incident giving rise to the suit," but does not itself create a right of action.

The Safety Act provides for administrative sanctions against the operator of a carnival or amusement park for violating the statutory or regulatory scheme.  For example, in a suit brought by the DCA, an operator who "fails to comply with the provisions of [the Safety Act] shall be liable to a fine of not more than $5,000 per day for each violation."  N.J.S.A. 5:3-54.  The DCA is also empowered "to bring injunctive proceedings in any court . . . to compel compliance with any lawful order made by [it] pursuant to [the Safety Act]."  N.J.S.A. 5:3-53.

The Act implements an administrative and regulatory scheme enforced by the executive branch; it does not give rise to a private cause of action or a tort-liability scheme.  In that respect, the Safety Act is unlike the Consumer Fraud Act, N.J.S.A. 56:8-1 to -195, which "provides a private cause of action to consumers who are victimized by fraudulent practices in the marketplace."  Gonzalez v. Wilshire Credit Corp., 207 N.J. 557, 576 (2011) (citing Lee v. Carter-Reed Co., 203 N.J. 496, 521 (2010)).  Indeed, under the Consumer Fraud Act, citizens are empowered to act as "private attorneys general" in bringing civil actions to enforce the Act.  Lemelledo v. Beneficial Mgmt. Corp., 150 N.J. 255, 268-69 (1997).

The Safety Act is also unlike the Ski Act, N.J.S.A. 5:13-1 to -12; the Roller Skating Rink Safety and Fair Liability Act, N.J.S.A. 5:14-1 to -7; and the Equine Activities Liability Act,

20

N.J.S.A. 5:15-1 to -12.  Those statutes set forth tort-liability schemes in which the duties of operators and patrons are enumerated and the conditions for filing a lawsuit are precisely defined.  See N.J.S.A. 5:13-3 to -10; N.J.S.A. 5:14-4 to -7; N.J.S.A. 5:15-3 to -12.

Although the Safety Act does not give rise to a private cause of action or set forth a tort-liability scheme, it does articulate legislative and regulatory standards of conduct intended to protect members of the public who patronize amusement parks, and, as such, violations of those standards may be considered as evidence of negligence, or even gross negligence, in a common-law cause of action.  See Alloway v. Bradlees, Inc., 157 N.J. 221, 236 (1999) (finding applicable in workplace injury case "the well-established principle that the violation of a legislated standard of conduct may be regarded as evidence of negligence if the plaintiff was a member of the class for whose benefit the standard was established"); J.S. v. R.T.H., 155 N.J. 330, 349 (1998) (stating that violation of child-abuse reporting statute, N.J.S.A. 9:6-8.10, "may constitute evidence of negligence in [appropriate] circumstances"); Fortugno Realty Co. v. Schiavone-Bonomo Corp., 39 N.J. 382, 391-92 (1963) (noting that violation of "statute would be applicable as evidence of negligence" provided plaintiff is member of "class for whose benefit the statute was

21

enacted"). In addition, violations of "regulations are pertinent in determining the nature and extent of any duty of care." Alloway, supra, 157 N.J. at 236; see also id. at 240-41 ("Facts that demonstrate [a regulatory] violation constitute evidence of negligence that is sufficient to overcome a motion for summary judgment.").

The Safety Act provides that an operator of a carnival-amusement ride must post "in a conspicuous public place on or near the ride . . . . [a]ll applicable written warnings and directions regarding . . . the proper use of the ride and the potential injuries in connection with improper use of the ride." N.J.S.A. 5:3-36.2(b). Certain regulations promulgated under the Safety Act are intended to inform and protect patrons using water park rides. For example, a water-ride operator must post "[s]igns required or recommended by the ride manufacturer." N.J.A.C. 5:14A-12.6(o)(1).[12] N.J.A.C. 5:14A-4.12(b) also provides that an amusement-ride owner shall post "in a conspicuous location" "clearly legible" warnings "for each ride which comply with manufacturer's requirements . . . and [the Safety Act]." In addition, the owner of an amusement ride must

_____

[12] N.J.A.C. 5:14A-12.6(o)(1) does not state that an amended type certification is a precondition for updating safety signage recommended by the manufacturer. Here, according to plaintiff, the manufacturer did not submit the 2008 updated manual to the DCA before the accident in 2010.

22

"comply with any manufacturer's recommendation or requirement," N.J.A.C. 5:14A-4.5(a), and "with the manufacturer's operating manual," N.J.A.C. 5:14A-9.8(a). Significantly, the owner must train operators of the ride "based on manufacturer requirements covered by the operational manual." N.J.A.C. 5:14A-4.8(b).

In this case, for instance, the owner of Sahara Sam's did not post the signs recommended in the manufacturer's 2008 operator's manual, which would have warned patrons that the failure to follow instructions could lead to severe permanent injuries or even death. Illustrations on the unposted signs would have instructed riders on the proper way to fall to avoid injury. If Sahara Sam's failed to post the signage as required by the Safety Act, then a jury may consider that failure as evidence of negligence, provided that there is a showing that the violation is relevant to the accident. See Alloway, supra, 157 N.J. at 236.

In sum, in given circumstances, "the violation of a statutory duty of care" may be admissible as evidence of negligence. Waterson v. Gen. Motors Corp., 111 N.J. 238, 263 (1988). In this case such evidence is permissible because the aggregation of alleged negligent acts or omissions may be considered in determining whether Sahara Sam's conduct reached the level of gross negligence.

B.

23

The principal issue in this appeal is whether the record, when viewed in the light most favorable to plaintiff, supported the trial court's grant of summary judgment dismissing plaintiff's claim of gross negligence.  To address this issue, we must first define gross negligence.

The tort of gross negligence falls on a continuum between ordinary negligence and recklessness, a continuum that extends onward to intentional conduct.  See Introductory Notes, Model Jury Charge (Civil) § 5.12 "Gross Negligence" (2009); see also Saba v. Compagnie Nationale Air Fr., 78 F.3d 664, 668 (D.C. Cir. 1996) ("There is a continuum that runs from simple negligence through gross negligence to intentional misconduct. Recklessness, or reckless disregard, lies between gross negligence and intentional harm.").

A business owner owes a duty of care to patrons invited onto the business's premises -- a duty "to take reasonable precautions to prevent the occurrence of foreseeable harm" to those patrons.  Weinberg v. Dinger, 106 N.J. 469, 484 (1987); accord Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 433 (1993) (stating that property owner owes higher degree of care to business patron than social guest because of furtherance of commercial interests).  Stated differently, a business owner has a duty "[t]o act non-negligently" toward the business's patrons. Weinberg, supra, 106 N.J. at 484; accord Hopkins, supra, 132

24

N.J. at 433. Negligence is defined generally as the failure to exercise "that degree of care for the safety of others, which a person of ordinary prudence would exercise under similar circumstances." Model Jury Charge (Civil) § 5.10A "Negligence and Ordinary Care – General" (2009); see also Aiello v. Muhlenberg Reg'l Med. Ctr., 159 N.J. 618, 632 (1999) (defining negligence as "the failure to exercise reasonable care"). The duty of care owed to a business patron must take into consideration the magnitude and likelihood of harm to which the patron is exposed by activities on the premises. McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 303 (1970).

As is evident by its descriptive name, gross negligence is a higher degree of negligence, see Monaghan v. Holy Trinity Church, 275 N.J. Super. 594, 599 (App. Div. 1994), and undoubtedly denotes "the upper reaches of negligent conduct," Parks v. Pep Boys, 282 N.J. Super. 1, 17 n.6 (App. Div. 1995). See also Kain v. Gloucester City, 436 N.J. Super. 466, 482 (App. Div.) (noting that gross negligence "is commonly associated with egregious conduct"), certif. denied, 220 N.J. 207 (2014). Whereas negligence is "the failure to exercise ordinary or reasonable care" that leads to a natural and probable injury, gross negligence is "the failure to exercise slight care or diligence." Introductory Notes, Model Jury Charge (Civil) § 5.12 "Gross Negligence" (2009). Although gross negligence is

25

something more than "inattention" or "mistaken judgment," it does not require willful or wanton misconduct or recklessness. Model Jury Charge (Civil) § 5.12 "Gross Negligence" (2009).

The New Jersey Civil Model Jury Charge defines gross negligence as

> an act or omission, which is more than ordinary negligence, but less than willful or intentional misconduct. Gross negligence refers to a person's conduct where an act or failure to act creates an unreasonable risk of harm to another because of the person's failure to exercise slight care or diligence.
>
> [Ibid.]

The model jury charge also conveys that gross negligence is an indifference to another by failing to exercise even scant care or by thoughtless disregard of the consequences that may follow from an act or omission. See id. n.1.

Similar definitions of gross negligence have been adopted by other jurisdictions. See, e.g., City of Santa Barbara v. Super. Ct., 161 P.3d 1095, 1099 (Cal. 2007) (defining gross negligence "as either a 'want of even scant care' or 'an extreme departure from the ordinary standard of conduct'" (quoting Eastburn v. Reg'l Fire Prot. Auth., 80 P.3d 656, 662 (Cal. 2003))); Thompson v. Bohlken, 312 N.W.2d 501, 504 (Iowa 1981) (defining gross negligence as more "than ordinary inadvertence or [i]nattention" and as "differ[ing] from ordinary negligence only in degree, not kind"); Ambrose v. New Orleans Police Dep't

26

Ambulance Serv., 639 So. 2d 216, 219-20 (La. 1994) ("[G]ross negligence has been described as an 'extreme departure from ordinary care or the want of even scant care.'" (quoting W. Page Keeton, et al., Prosser & Keeton on the Law of Torts, § 34, at 211 (5th ed. 1984); 65 C.J.S. Negligence § 8(4)(a) at 539-40 (1966 & Supp. 1993))); Cowan v. Hospice Support Care, Inc., 603 S.E.2d 916, 918 (Va. 2004) (defining gross negligence as "showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person," but which "demonstrat[es] something less than willful recklessness" (citing Koffman v. Garnett, 574 S.E.2d 258, 260 (Va. 2003); Griffin v. Shively, 315 S.E.2d 210, 213 (Va. 1984); Ferguson v. Ferguson, 181 S.E.2d 648, 653 (Va. 1971))).

We endorse the definition of gross negligence found in our Civil Model Jury Charge and reject the trial court's and appellate panel majority's description of gross negligence as the equivalent of willful conduct. We recognize that gross negligence has been subject to varying definitions and find understandable the error of the trial and appellate courts.[13] To

---

[13] Unlike New Jersey, a number of jurisdictions make no distinction between gross negligence and recklessness. See Restatement (Second) of Torts § 282 (1965) ("[G]ross negligence . . . is sometimes construed as equivalent to reckless disregard."); see also, e.g., W. Cash & Carry Bldg. Materials,

be clear, reckless and willful conduct are degrees of civil culpability greater than gross negligence. Reckless conduct is "the conscious disregard . . . to a known or obvious risk of harm to another" whereas "[w]illful misconduct implies an intentional deviation from a clear duty" owed to another. Anderson v. Massillon, 983 N.E.2d 266, 273 (Ohio 2012). In sum, negligence, gross negligence, recklessness, and willful conduct fall on a spectrum, and the difference between negligence and gross negligence is a matter of degree.

IV.

We now apply those principles to determine whether the trial court properly granted summary judgment. On a motion for summary judgment, if the evidence of record -- the pleadings, depositions, answers to interrogatories, and affidavits -- "together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. R.

Inc. v. Palumbo, 371 So. 2d 873, 877 (Miss. 1979) (equating gross negligence with "reckless indifference to consequences" (quoting Teche Lines, Inc. v. Pope, 166 So. 539, 540 (Miss. 1936))); Colnaghi, U.S.A. v. Jewelers Protection Servs., 611 N.E.2d 282, 284 (N.Y. 1993) (equating gross negligence with "reckless disregard" and "intentional wrongdoing" (citing Sommer v. Fed. Signal Corp., 593 N.E.2d 1365, 1371 (N.Y. 1992))); Sheets v. Pendergrast, 106 N.W.2d 1, 5 (N.D. 1960) (describing gross negligence as "practically willful" (citing Rettler v. Ebreck, 71 N.W.2d 759 (N.D. 1955); Norgart v. Hoselton, 39 N.W.2d 427 (N.D. 1949); Farmers' Mercantile Co. v. N. Pac. Ry. Co., 146 N.W. 550 (N.D. 1914))).

28

4:46-2(c); see Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted. R. 4:46-2(c); see Brill, supra, 142 N.J. at 540.

Our task is not to weigh the evidence, not to decide who has the better case or who is more likely to succeed before the jury. The strength of Sahara Sam's case is not at issue. Although the facts are hotly disputed between the parties, at this procedural stage, our role is simply to view the record in the light most favorable to plaintiff and resolve whether, on that basis, a reasonable factfinder could find that plaintiff's injuries were proximately caused by the gross negligence of Sahara Sam's.

Based on that standard, we agree with the dissent in the Appellate Division that the trial court erred in granting summary judgment. A brief review of the relevant evidence, presented in the light most favorable to plaintiff, demonstrates that a rational factfinder could conclude that Sahara Sam's conduct constituted gross negligence.

The FlowRider is an extreme sport and high-risk recreational activity that simulates surfing. Nevertheless, at the time that plaintiff participated in the ride, Sahara Sam's did not post the updated signage recommended by the

29

manufacturer.  Had Sahara Sam's done so, and presuming that plaintiff would have read and been drawn to the illustrations on the new signage, plaintiff would have better known of the greater potential for severe permanent injury by riding the flowboard.  Because Sahara Sam's did not post the manufacturer's 2008 signage, plaintiff was not told:  (1) "YOU WILL FALL"; (2) "DO NOT RIDE!" the flowboard if you could aggravate a preexisting condition; (3) "FAILURE TO COMPLY WITH SIGNS OR INSTRUCTIONS MAY INCREASE THE RISK OF SEVERE PERMANENT INJURIES OR EVEN DEATH"; (4) "FALLING MAY RESULT IN . . . YOUR BODY STRIKING THE SURFACE OF THE FLOWRIDER WITH GREAT FORCE"; and (5) "BEFORE ATTEMPTING TO RIDE, WATCH THE SAFETY VIDEO AND UNDERSTAND THE RISKS OF THIS ACTIVITY."  The updated signage -- unlike the signage in use on the day of the accident -- also provided drawings that illustrated the danger of striking one's head on either the surface of the FlowRider or the flowboard and the safety measures to take to avoid a head injury.

The factfinder is permitted to draw inferences from Sahara Sam's failure to follow the manufacturer's recommendations and to consider as evidence of negligence the failure to comply with safety regulations promulgated under the Safety Act.  See N.J.A.C. 5:14A-9.8(a) ("The owner of an amusement ride shall operate the ride in accordance with the manufacturer's operating manual."); N.J.A.C. 5:14A-12.6(o)(1) (stating that "[s]igns

30

required or recommended by the ride manufacturer" must be posted).

In addition, Sahara Sam's staff did not properly instruct plaintiff on the proper use of the FlowRider. The attendants did not suggest to plaintiff that, as a first-time rider, he ride on a bodyboard lying in the prone position or instruct him that he not wrap the rope around his wrist and not hold the rope with both hands if riding on a flowboard. Plaintiff's expert concluded that plaintiff's failure to let go of the rope as he was falling propelled him forward and proximately caused the severe and permanent injuries that he suffered. Plaintiff also was not given the option of watching the safety video that is mentioned in the signage but was never posted -- a video that apparently was unavailable to the lifeguards in charge of the FlowRider. Additionally, Sahara Sam's did not give lifeguards written training protocols to review or require them to read the operator's manual.

The issue is not whether Sahara Sam's failed to exercise reasonable care in any one instance. Rather, it is whether viewing the entire tableau in the light most favorable to plaintiff, a factfinder could conclude that by not implementing the safety features in the 2008 operator's manual and not giving plaintiff the necessary safety instructions, Sahara Sam's failed to exercise slight care or diligence or demonstrated an extreme

31

departure from the standard of reasonable care.  Viewed in that light, we hold that a rational factfinder could conclude that the proximate cause of plaintiff's injuries was the gross negligence of Sahara Sam's.

V.

For the reasons expressed, we reverse the judgment of the Appellate Division affirming the trial court's grant of summary judgment, which dismissed plaintiff's claim of gross negligence. We therefore reinstate the gross-negligence claim and remand to the trial court for proceedings consistent with this opinion.


CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, PATTERSON, FERNANDEZ-VINA, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE ALBIN's opinion.