**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0971-17T3

JOSE CRUZ and KAREN CRUZ,

     Plaintiffs-Appellants,

v.

TRUSTEES OF CALVARY
BAPTIST CHURCH and
CALVARY BAPTIST CHURCH,

     Defendants-Respondents.

_____

        Argued February 4, 2019 – Decided July 5, 2019

        Before Judges Messano, Fasciale and Gooden Brown.

        On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-1286-16.

        Steven F. Wukovits argued the cause for appellants (Triarsi, Betancourt, Wukovits & Dugan, LLC, attorneys; Steven F. Wukovits, of counsel and on the brief; Richard D. Huxford, on the brief).

        Gary L. Riveles argued the cause for respondents (MacNeill, O'Neill & Riveles, LLC, attorneys; Gary L. Riveles, of counsel and on the brief; Ethan Lillianthal, on the brief).

PER CURIAM

Plaintiffs Jose and Karen Cruz[1] appeal from the September 29, 2017 Law Division order, granting summary judgment to defendants Calvary Baptist Church and its Trustees, and dismissing plaintiff's personal injury complaint with prejudice. Plaintiff argues the motion judge erred in granting summary judgment under the Charitable Immunity Act (the Act), N.J.S.A. 2A:53A-7,[2] because the evidence presents a genuine issue of material fact that defendants were grossly negligent. We disagree and affirm.

Plaintiff sustained a severe back injury when he fell on defendants' property. He filed a three-count complaint against defendants, sounding in

---

[1] Although Mr. and Mrs. Cruz are both plaintiffs, for the convenience of the reader, we refer to Mr. Cruz as plaintiff throughout this opinion.

[2] The Act provides that:

> [n]o non[-]profit corporation, society[,] or association organized exclusively for religious, charitable[,] or educational purposes or its trustees, directors, officers, employees, agents, servants[,] or volunteers shall . . . be liable to respond in damages to any person who shall suffer damage from the negligence of any agent or servant of such corporation, society[,] or association, where such person is a beneficiary, to whatever degree, of the works of such non[-]profit corporation, society[,] or association . . . .
>
> [N.J.S.A. 2A:53A-7(a).]

2

premises liability and seeking monetary damages. Defendants filed a contesting answer and asserted affirmative defenses, including invoking immunity from suit pursuant to the Act. After depositions were conducted and expert reports were exchanged, defendants moved for summary judgment, arguing that plaintiff's complaint should be dismissed because the Act barred plaintiff from advancing a simple negligence claim against defendants, and no reasonable jury could conclude that defendants were grossly negligent. Plaintiff opposed the motion, asserting that defendants' violation of various construction and building codes constituted gross negligence. We derive the following facts from the motion record, viewed in the light most favorable to plaintiff. Angland v. Mountain Creek Resort, Inc., 213 N.J. 573, 577 (2013) (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995)).

On March 21, 2014, plaintiff attended a funeral at defendant Calvary Baptist Church (the church), located in the City of East Orange (the City). He arrived at approximately 9:15 a.m., backed his 2005 Chevy Blazer SUV into a parking spot in the church's parking lot so that his rear tires were adjacent to a "parking bumper," and "walked to the back" of his vehicle to retrieve his overcoat from the trunk. In order to open the trunk, plaintiff took a step backwards from the trunk's "lift gate to give [him]self room[.]" When he did

so, he tripped over "something" and fell over a concrete retaining wall, landing on the ground a few feet below. After he fell, plaintiff remained on the ground for approximately fifteen minutes, "yelling for help." Eventually, someone came to his aid, and he was taken by ambulance to the hospital. As a result of the fall, plaintiff sustained two fractures in his back at L2 and L5, and subsequently underwent two surgeries and extensive physical therapy.

The retaining wall plaintiff fell over was located behind the "parking bumper" where plaintiff parked his vehicle. Approximately three to four feet away from the retaining wall on a lower elevation was a fence enclosing an adjacent apartment building. Beyond the retaining wall was a drop from the parking lot to an alleyway located between the retaining wall and the fence. On top of the retaining wall itself was a small lip. According to plaintiff's deposition testimony, he tripped over the retaining wall's "lip or something else," which caused him to fall into the alleyway between the retaining wall and the fence. Plaintiff testified he had never attended the church before, and while walking to the rear of his vehicle, he could not "tell that the parking lot end[ed]." Instead, it actually appeared to him as if "the fence [was] part of the wall of the parking lot" and he did not see a drop off below the retaining wall. Plaintiff further

4

stated that he did not notice the lip on top of the retaining wall at any point prior to his fall, and was unsure whether that was what he tripped over.

In his deposition, Clarence Osborne,[3] a trustee of the church and "the Chair[person] of the Buildings and Grounds Committee[,]" testified that the church was built in 1970, was a 501(c)(3) non-profit entity organized exclusively for religious purposes, and operated "[t]hrough tithings and offerings" from church members and congregants. According to Osborne, the Buildings and Grounds Committee was responsible for "mak[ing] assessments of the church property," including the parking lot, "to see what [was] in need of repair or replacement." Osborne testified he was unaware of any prior accidents involving the retaining wall, or incidents where someone fell over the retaining wall. Also, Osborne had no knowledge of the church being the subject of any lawsuits or being cited for any building code or ordinance violations concerning the parking lot. According to Osborne, the only complaints about the parking lot "were two [pot]holes" and "a separation of the asphalt leading to the entrance[]" of the church, all of which were repaired.

Osborne acknowledged that at the time in question, there were no signs or warnings posted about a tripping hazard, and there were no signs warning

---

[3] Osborne's name appears alternately as Osbourne in the record.

against backing up into parking spots located in front of the retaining wall. Osborne also acknowledged that there was no fence on the retaining wall,[4] and that the retaining wall varied in height in different places due to the parking lot's elevation. According to Osborne, the bumper stops in the parking lot were occasionally knocked over or "out of position" and either he or another trustee was responsible for repositioning them back to their original state.

The church secretary, Tonisha Cook, explained in her deposition that the only parking lot complaints she was aware of involved "minor complaints" about the parking lot "need[ing] to be repaved." She also recalled that "[t]here [was] a 'park at your own risk' sign" posted in the parking lot. Like Osborne, she testified she was unaware of any prior incidents where someone fell over the retaining wall. She also stated that she was at the church when plaintiff fell and saw him "laying on his back" "in a lot of pain," but "did [not] see him actually fall."

Based on his inspection of the site on April 20, 2017, plaintiff's expert, Charles Witczak, opined that defendants "did not meet [various] code[] and industry standards" embodied in Chapters 51 and 159 of the East Orange

---

[4] After plaintiff's fall, Osborne and another trustee installed a fence on the retaining wall.

Municipal Code, New Jersey's Uniform Construction Code, N.J.A.C. 5:23-1.1 to -12A.6, Section 1013 of the 2015 International Building Code (IBC), New Jersey Edition, and ASTM International's standards. According to Witczak, "[t]he hazard to safety created by the construction of the retaining wall without any protective fencing at the location of . . . plaintiff's accident did not meet the requirements set forth in" the City of East Orange Municipal Ordinance § 51-194, prohibiting the construction of a retaining wall "so as to constitute a hazard to . . . safety." Further, in violation of City of East Orange Municipal Ordinance §§ 159-4 and 159-62, "the height of unprotected wall drastically exceeded the minimum height of . . . approximately [twenty-one inches.]" Thus, according to Witczak, defendants "failed to protect the safety of the people using the facility by allowing the dangerous condition" "created by the lack of protective railing at a severe drop along the retaining wall [to] exist[] for decades," despite defendants having "significant time to undertake the appropriate corrective measures."

Witczak also opined that "allowing the dangerous condition created by" the retaining wall violated N.J.A.C. 5:23-1.3(a)(5), a regulation requiring "adequate maintenance of buildings and structures throughout the State" in order to "adequately protect the health, safety[,] and welfare of the people."

7

Additionally, according to Witczak, Section 1013.1 and 1013.2 of the IBC required "guards . . . not less than [forty-two] inches . . . high" "along open-sided walking surfaces." Witczak continued:

> The parking area is considered an open[-]sided walking surface by definition. The height of the walking/parking area at the location of . . . plaintiff's accident was measured to be [forty-five] inches above the adjacent asphalt area, which exceeds . . . the maximum allowable per code. If the concrete retaining wall was considered to be a guard, it was measured to extend [six inches] above the walking/parking surface, which is significantly less than the [forty-two inches] minimum height allowed by code. These deficiencies combined result in a dangerous walkway condition.

Witczak concluded defendants' "failure to install a protective guard per code requirements . . . posed a dangerous risk and disregarded the serious consequences to pedestrians at the parking area, like [plaintiff.]" According to Witczak, "[n]ot only did [defendants] leave a dangerous condition on [the] premises unprotected, they did not provide any warning of this condition to alert the pedestrians using the facility so that they might be able to avoid same."

Witczak further explained that in accordance with ASTM standards, defendants "could have easily provided signs in the area of the dangerous wall condition to warn pedestrians of its presence." "The signs could have not only provided warning of the dangerous condition at the unprotected [retaining] wall,

A-0971-17T3

but could have also given specific directions to motorists ('Do Not Back Into Space', 'Head-In Parking Only') that would encourage them to take actions that may help avoid the dangerous condition." Based on these findings, Witczak opined "within a reasonable degree of engineering probability that the dangerous conditions of the parking area . . . w[ere] the cause of the accident suffered by [plaintiff]."

In response, in an August 4, 2017 report, defendants' expert, Jason D. Boyd, disagreed that the church was "required to be brought up to standards of subsequent building code editions as suggested in [Witczak's] report." Instead, Boyd asserted that "[h]istoric structures [were] required to be constructed to the building code that was adopted at the time of construction" and "it [was] likely that the building and site were reviewed, inspected, and approved by the City for use at the time of construction." Further, "[t]here [was] no evidence of the City notifying [defendants] of a violation or requiring any work to be completed on the . . . retaining wall[,]" and "no evidence of any prior incidents associated with the . . . retaining wall since the time of construction through the date of [plaintiff's] incident."

Boyd also refuted Witczak's assertion that the City's "property maintenance code . . . definitively state[d] that retaining walls in parking lots . . .

required . . . guarding or rails[.]"  Additionally, based on plaintiff's statement that "[h]e did not know what he tripped on" and plaintiff's indication that "he was moving backwards at the time of his fall," Boyd stated that the fall "could have been avoided" had plaintiff been "paying attention to where he was stepping, and caring for his own safety" at "the time of the incident."  Thus, "within a reasonable degree of engineering certainty," Boyd disputed Witczak's conclusion.

On September 29, 2017, following oral argument, Judge Andrea G. Carter granted defendants' motion.  In an oral opinion, Judge Carter recited the applicable legal standard for summary judgment, and determined that "[m]any of the facts in this case [were] largely undisputed."  Turning first to whether defendants were entitled to the immunity afforded under the Act, the judge noted "[t]here was [not] much argument against that."  The judge explained that a "501[(c)(3)] designation for an educational or religious organization automatically establishes the first two prongs of the . . . Act['s] test assuming they do not seek governmental assistance in completing their charitable purpose."  Thus, the judge determined, "[a]s a matter of law," that defendants satisfied the first two prongs because they were "non-profit and operate[d] for a religious purpose."

A-0971-17T3

The judge also found defendants met the third prong because defendants were "engaging in the promotion of its religious objective by conducting a religiously themed funeral service, which was the very reason for plaintiff's presence on the property." See Tonelli v. Bd. of Educ., 185 N.J. 438, 444-45 (2005) (reiterating that pursuant to the Act, an institution seeking immunity "must demonstrate that it '(1) was formed for non[-]profit purposes; (2) is organized exclusively for religious, charitable[,] or educational purposes; and (3) was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works'" (quoting Hamel v. State, 321 N.J. Super. 67, 72 (App. Div. 1999))); Ryan v. Holy Trinity Evangelical Lutheran Church, 175 N.J. 333, 346 (2003) (subscribing to the view that "[e]ntities that can prove they are organized exclusively for educational or religious purposes automatically satisfy the second prong of the charitable immunity standard"); Rupp v. Brookdale Baptist Church, 242 N.J. Super. 457, 463 (App. Div. 1990) (immunizing "the defendant church from liability for injuries sustained by a nonmember who merely attended a wedding ceremony at the church" and holding that "beneficiary status does 'not depend upon a showing that the claimant personally received a benefit from the works of the charity[,]'" but "[r]ather the test is 'whether the institution pleading the

11

immunity, at the time in question[,] was engaged in the performance of the charitable objectives it was organized to advance'" (emphasis omitted) (quoting Anasiewicz v. Sacred Heart Church, 74 N.J. Super. 532, 536 (App. Div. 1962))).

Next, the judge turned to "the main issue . . . for resolution," namely "whether . . . defendants could be found . . . grossly negligent." Citing Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 364 (2016), the judge explained that "gross negligence [was] a higher form of negligence, which undoubtedly denotes the upper reaches of negligent conduct" and was "a fact[-]sensitive question." The judge continued:

> Here[,] there are several undisputed facts, which may speak to whether or not the actions of . . . defendants or inactions of . . . defendants could possibly be considered gross negligence.
>
> . . . [G]iving [plaintiff] the benefit of all favorable and reasonable inferences from the evidence[,] . . . defendants could arguably be held to be in violation of the East Orange Property Maintenance Code, . . . New Jersey Uniform Construction Code, . . . and . . . not meet the standards set forth by the 2015 New Jersey International Building Codes.
>
> . . . [D]efendants have also failed to include any signage warning those entering the parking lot that there is a drop at the edge of the lot. . . . [D]efendants argue, however, that they were not on notice of any issues with the retaining wall, that no one had ever . . . fallen before, and that this was a condition that was . . . obvious and also that there was no evidence that . . .

12

defendant[s] deviated from the standard of care as to the parking lot perimeter.

> Part of the argument being presented by . . . plaintiff as to what elevates the actions or omissions of . . . defendants . . . from negligence to gross negligence is . . . the fact that . . . they installed wheel stops, which would prevent a vehicle from driving . . . over the retaining wall. . . . [S]o the argument . . . is that the conduct should not stop there, that there should be some actions to address pedestrians who could . . . also potentially fall.

In rejecting plaintiff's argument, the judge concluded "the actions" and "omissions of . . . defendants . . . speak to, at best, negligence." The judge found no facts "that would elevate this from sheer negligence to now gross negligence." The judge entered a memorializing order and this appeal followed.

We review a grant of summary judgment applying the same standard used by the trial court. Id. at 366. That standard is well-settled.

> [I]f the evidence of record—the pleadings, depositions, answers to interrogatories, and affidavits—"together with all legitimate inferences therefrom favoring the non-moving party, would require submission of the issue to the trier of fact," then the trial court must deny the motion. On the other hand, when no genuine issue of material fact is at issue and the moving party is entitled to a judgment as a matter of law, summary judgment must be granted.
>
> [Ibid. (citation omitted) (quoting R. 4:46-2(c)).]

Applying these principles, we are satisfied that the judge correctly granted defendants summary judgment and affirm substantially for the reasons expressed in Judge Carter's comprehensive and well-reasoned oral opinion.

On appeal, plaintiff renews his argument that while defendants "may meet the three . . . part test to qualify for protection under [the Act]," his claims involve "actions and omissions" by defendants that were grossly negligent, rendering the Act inapplicable. We disagree.

N.J.S.A. 2A:53A-7(c)(1) provides that charitable immunity does not apply to "any trustee, director, officer, employee, agent, servant[,] or volunteer causing damage by a willful, wanton[,] or grossly negligent act of commission or omission." "Although the statute does not define gross negligence, the term is commonly associated with egregious conduct," and "is used to describe 'the upper reaches of negligent conduct.'" Kain v. Gloucester City, 436 N.J. Super. 466, 482 (App. Div. 2014) (quoting Parks v. Pep Boys, 282 N.J. Super. 1, 17 n.6 (App. Div. 1995)). See Steinberg, 226 N.J. at 364 (citing to the Model Jury Charge (Civil), 5.12, "Gross Negligence" (rev. Mar. 2019), that "[a]lthough gross negligence is something more than 'inattention' or 'mistaken judgment,' it does not require willful or wanton misconduct or recklessness").

In Kain, the plaintiff "was a parent/chaperone for his sons' Boy Scout troop" participating "in a free educational sail" at the Gloucester City Pier "provided by defendant Gloucester City Sail, Inc.," a "non[-]profit corporation created for the purpose of providing maritime education to children." 436 N.J. Super. at 470-71. Before deeding the pier to the defendant, the Coast Guard had renovated the pier, resulting in a design that "left openings between the edges of the pier and the wooden bumpers every few feet along the perimeter of the pier." Id. at 471. The "[p]laintiff was injured when he stepped into an opening between the edge of the pier and its wooden bumpers as he was helping the last boy onto the . . . schooner." Id. at 470.

The "[p]laintiff filed a complaint based on premises liability" against defendant Gloucester City Sail, Inc., and its Director of Operations, among others. Id. at 471-72. We affirmed the trial court's decision, granting the defendants summary judgment on the ground that the claims were barred by the Act. Id. at 470-72. Pertinent to this appeal, we rejected the plaintiff's contention that the "defendants' actions constitute[d] reckless and grossly negligent behavior because they required civilian passengers to cross the pier with 11" x 23" openings and use an aluminum household ladder to board the [schooner] in lieu of using the floating dock." Id. at 482.

We also rejected the plaintiff's reliance on his expert's opinion to support his position "that the 'accident site was in a dangerous and hazardous condition' and 'was totally unsafe and inappropriate for its intended use.'" Ibid. We agreed with the trial court that "the alleged dangerous and hazardous condition of the openings relate[d] to the original design of the pier, rather than a lack of care by [the defendant Director]." Ibid. We concluded that "[t]he proof [was], therefore, insufficient to establish a level of wrongful conduct that would deprive [the defendants] of the [Act's] immunity." Ibid.

Likewise, here, we are satisfied the record does not support a finding of gross negligence by defendants that would bar application of the Act's immunity. The parking lot was routinely used by the church since 1970, with no prior reported accidents or injuries. Further, plaintiff points to no case where the condition of the property, in and of itself, was sufficient to establish gross negligence. Instead, plaintiff relies on Steinberg to support his position, arguing that, as in Steinberg, the issue "is whether viewing the entire 'tableau' in [the] light most favorable to [him], a factfinder could conclude that by not implementing the 'safety' requirements" of the various codes, "not placing any signage warning . . . those entering the parking lot, and . . . having wheel stops that have constantly and previously moved and been replaced by members of the

16

church," defendants were grossly negligent. Plaintiff's reliance on <u>Steinberg</u> is misplaced.

In <u>Steinberg</u>, the plaintiff "suffered a catastrophic spinal cord injury" when he fell from "a water ride that simulated riding a surfboard" at defendant Sahara Sam's Oasis Water Park. 226 N.J. at 348. Although Sahara Sam's had received an "updated . . . manufacturer's manual, which provided for new signage . . . and more explicit safety-warning language" prior to the plaintiff's injury, it had not implemented it. <u>Id.</u> at 351. Further, although Sahara Sam's employees had been instructed in the safe use of the ride, they allegedly provided the plaintiff "very little instruction on how to ride." <u>Id.</u> at 353-54.

Prior to boarding the ride, the plaintiff executed a waiver immunizing Sahara Sam's from negligence suits. <u>Id.</u> at 350. Because "the waiver [was] unenforceable against a claim alleging gross negligence or a claim alleging the breach of a duty imposed by statute[,]" <u>id.</u> at 357, at issue was whether there was sufficient record evidence to defeat summary judgment on the issue of gross negligence where the plaintiff claimed "he was not placed on notice of the gravity of the danger and the precautions he should have taken to avoid injury." <u>Id.</u> at 351-52.

In reversing the grant of summary judgment to Sahara Sam's, the Court held:

> The issue is not whether Sahara Sam's failed to exercise reasonable care in any one instance. Rather, it is whether viewing the entire tableau in the light most favorable to plaintiff, a factfinder could conclude that by not implementing the safety features in the [updated] operator's manual and not giving plaintiff the necessary safety instructions, Sahara Sam's failed to exercise slight care or diligence or demonstrated an extreme departure from the standard of reasonable care. Viewed in that light, we hold that a rational factfinder could conclude that the proximate cause of plaintiff's injuries was the gross negligence of Sahara Sam's.
>
> [Id. at 368.]

The Court explained that "[t]he factfinder [was] permitted to draw inferences from Sahara Sam's failure to follow the manufacturer's recommendations and to consider as evidence of negligence the failure to comply with safety regulations promulgated under the Safety Act." Ibid. Those regulations required the owner of an amusement ride to operate the ride in accordance with the manufacturer's operating manual, N.J.A.C. 5:14A-9.8(a), and to post signs required or recommended by the manufacturer, N.J.A.C. 5:14A-12.6(o)(1). Steinberg, 226 N.J. at 368.

Steinberg is clearly distinguishable from the case at bar because defendants were obviously not operating "an extreme sport and high-risk

18

recreational activity . . . ." Id. at 367. Moreover, even accepting plaintiff's expert opinion, "the failure to comply with safety regulations promulgated under [a statute]" may be "consider[ed] as evidence of negligence," but would not alone support a finding of gross negligence. Id. at 368.

It is undisputed that defendants were never cited for any violations, had no prior incidents, and had no notice of any purported dangerousness of the retaining wall to pedestrians. Unlike Steinberg, defendants had no prior awareness of safety measures that were being intentionally disregarded. While the motion record may arguably support "inattention" on the part of defendants, "inattention" or "mistaken judgment," as a matter of law, is insufficient to establish gross negligence. Id. at 364. Therefore, we agree with the judge that summary judgment was appropriate.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0971-17T3