**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2968-22

JARI ALMONTE and YAHAIRA
ALMANZAR, individually and
as parents and natural guardians
of Jeremy Almonte, an infant,

     Plaintiffs-Appellants,

v.

TOWNSHIP OF UNION,
TOWNSHIP OF UNION FIRE
DEPARTMENT, and TOWNSHIP
OF UNION VOLUNTEER
AMBULANCE SQUAD,

     Defendants,

and

ATLANTIC AMBULANCE
CORPORATION, UNION EMERGENCY
MEDICAL UNIT, DANIEL PERNELL,
DENYEL CUSIMANO, R. IUNGERMAN,
"JOHN" BIEDRZYCKI, NITI SHARMA, M.D.,
and OVERLOOK MEDICAL CENTER,

     Defendants-Respondents.

_____

Argued October 22, 2024 – Decided November 18, 2024

Before Judges Smith and Vanek.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-3994-18.

Hugh M. Turk argued the cause for appellants (Sullivan Papain Block McGrath Coffinas & Cannavo, PC, attorneys; Hugh M. Turk, on the briefs).

Lauren E. Aguiar (Skadden, Arps, Slate, Meagher & Flom, LLP) of the New York bar, admitted pro hac vice, argued the cause for respondents Atlantic Ambulance Corporation, David Pernell, improperly pled as Daniel Parnell, Denyel Cusimano, and AHS Hospital Corp. d/b/a Overlook Medical Center, improperly pled as Overlook Medical Center (Connell Foley, LLP, Lauren E. Aguiar and Andrew Muscato (Skadden, Arps, Slate, Meagher & Flom LLP) attorneys; Jeffrey W. Moryan, Susan Kwiatkowski and Lauren E. Aguiar, of counsel and on the briefs; Andrew Muscato, on the briefs).

PER CURIAM

Plaintiffs, Jari Almonte and Yahaira Almanzar, individually and as parents and guardians of Jeremy Almonte, appeal from the motion court's order granting defendants' motion for summary judgment. Jeremy was a 21-month-old toddler when he fell while playing and hit his head. After the fall, he began seizing and vomiting fluid. He was taken to the hospital by an advanced life support (ALS) crew consisting of paramedics.

A-2968-22

En route to the hospital, Jeremy had difficulty breathing. After getting authorization from their medical command physician to do so, the paramedics made three attempts to intubate the child, with the third, partially successful attempt taking place in the hospital parking lot. Shortly after the paramedics brought Jeremy into the emergency room, he suffered a cardiac arrest. Emergency medical personnel revived him, but he suffered serious and permanent brain injury.

Plaintiffs sued several defendants,[1] including the paramedics and their employer, claiming that they deviated from their standard of care while treating Jeremy, causing his injury. Plaintiffs' main contention was that the paramedics improperly decided to keep Jeremy in the ambulance to make an additional intubation attempt rather than immediately take him into the emergency room where he could receive more sophisticated care.

After discovery, defendants moved for summary judgment, arguing they were immune from civil liability pursuant to N.J.S.A. 26:2K-14, which shields

---

[1] Plaintiffs voluntarily dismissed their complaint against defendants Union Township and the Union Township Fire Department on March 14, 2019. Defendant Union Township Volunteer Ambulance Squad was dismissed from the litigation for lack of prosecution on June 7, 2019. Defendant AHS Hospital Corp./Overlook Hospital, improperly pled as Overlook Hospital, was granted summary judgment by the trial court on April 26, 2023. That order is not on appeal before us.

paramedics from damages "as the result of an act or the omission of an act committed while in training for or in the rendering of basic and advanced life support services in good faith and in accordance with this act."

The trial court granted defendants' motion and dismissed plaintiffs' complaint. Plaintiffs appeal, contending the paramedics: did not provide their services in good faith; did not provide advanced life support services; and did not provide ALS services in accordance with the Emergency Medical Services Act. Finally, they argue defendants were grossly negligent in their care of Jeremy. We affirm.

## I.

### A.

On August 18, 2012, Jeremy Almonte, a 21-month-old child, was playing at home when he fell on a hardwood floor, hit his head, and began seizing. Jeremy's mother immediately called 9-1-1, and an ambulance was dispatched. Basic life support (BLS) team members R. Iungerman and John Biedrzycki from the Union Township Volunteer Ambulance Corps arrived at the home by 9:00 p.m. They found Jeremy unresponsive and actively seizing but breathing on his own. They began administering oxygen, suctioning fluid from his airway, and loaded Jeremy into the ambulance.

4

Defendants David Pernell and Denyel Cusimano, an ALS team from Atlantic Ambulance Corporation, arrived at 9:10 p.m. and took over Jeremy's care. Their initial assessment found Jeremy unresponsive with cool extremities and labored breathing, actively seizing, and being suctioned by the BLS team as he was vomiting large amounts of fluid. Jeremy's jaw was clenched shut.

Pernell started an IV, and at 9:17 p.m. he contacted the medical command physician, Dr. Niti Sharma. Pernell relayed the team's assessment of Jeremy to Dr. Sharma, who ordered one milligram of an anticonvulsant for the seizures and authorized a second dose if necessary. Pernell also requested authorization to intubate in case it became necessary, which Dr. Sharma granted. Pernell administered the second one milligram dose of anticonvulsant at 9:19 p.m., and the ambulance left for University Hospital at 9:23 p.m. Jeremy's mouth partially opened at approximately 9:28 p.m. Cusimano was able to insert an oral airway, and the team suctioned large amounts of fluid from Jeremy's oral and nasal airways while performing ventilation via a bag-valve mask.

At 9:29 p.m., the paramedics' notes reflect that Jeremy's respiratory drive had decreased. At 9:30 p.m., Pernell contacted Medical Command and requested authorization to intubate. Dr. Sharma authorized intubation via rapid

sequence intubation (RSI), in which certain medications[2] are administered to paralyze the patient's facial muscles so the paramedics could complete intubation. Pernell administered the RSI medications at 9:34 p.m., and at 9:35 p.m. Cusimano unsuccessfully attempted to intubate Jeremy. The paramedics continued to suction and ventilate the child using the bag valve mask.

The record shows the ambulance arrived at the hospital at 9:37 p.m. Cusimano made a second unsuccessful attempt to intubate Jeremy at 9:38 p.m. The paramedics found Jeremy's airway was still "completely full of fluid." Pernell testified at his deposition that when they pulled into the parking lot, they realized Jeremy still needed intubation, and "the decision was made to stop, secure his airway, and then proceed into the emergency room."

Pernell explained:

> [I]t would have been like . . . we have to reintubate him because he's already got medications[,] and his heart rate is starting to drop and his oxygen saturation is no good. We have to intubate him and it's easier to do it now than to move with him without the airway in place at all. It would have been reckless to move without it.

In her deposition, Cusimano echoed Pernell's reasoning, explaining they wanted to intubate Jeremy before moving him because:

---

[2] The medications which the paramedics administered to Jeremy to perform intubation were Etomidate and Succinylcholine.

[B]y the time you get equipment moved over and IV bag down and the stretcher out of the ambulance and walk down the hall . . . it's a minute and a half, almost two minutes before you are transferring care, so that's another minute and a half to two minutes with no oxygen. [We] would rather take the [forty-five] seconds and both of us work on him together, suctioning and intubating at the same time and get him a good airway.

At 9:42 p.m., Pernell was successful on the third intubation attempt. In her deposition, Cusimano testified that she understood medical command's authorization to intubate allowed paramedics to attempt multiple intubations, if necessary, without additional authorization for each attempt. Dr. Sharma testified that when she authorized intubation she "was not thinking about how many attempts they were going to have."

Pernell testified that they stayed in the ambulance getting ready to move Jeremy until 9:45 p.m. At roughly 9:45, Jeremy's heartrate dropped, and the paramedics began chest compressions. While Jeremy was transferred to the care of the hospital, he suffered a cardiac arrest for nine minutes during which he had no oxygen circulation, resulting in severe anoxic brain damage secondary to the cardio-pulmonary arrest. Jeremy was reintubated after he entered the hospital because there were "questions with position of the ET tube."

7

The parties each retained experts. Plaintiffs' expert, Dr. Kevin Brown M.D., a physician who was board certified in emergency medicine, identified several deviations from the standard of care for ALS paramedics. They included but were not limited to the paramedics': decision to keep Jeremy in the ambulance to make second and third intubation attempts rather than bringing him into the hospital immediately; failure to contact Dr. Sharma to update her on Jeremy's second failed intubation and his deteriorating condition; and the paramedics' failure to address Jeremy's unstable heart rhythm, bradycardia, and pulseless electrical activity by giving him timely and proper medications. Dr. Brown wrote the "failure to immediately bring Jeremy inside the [emergency room] deprived [him] of sophisticated medical care that was at most a few hundred feet away." Dr. Brown also opined the paramedics did not maintain sufficient contact with medical command, and that they should have called to report Jeremy's condition after 9:37 as he began to deteriorate.

Defendants' expert, Dr. Peter C. Benson, was a physician with double-board certification in emergency medicine and emergency medical services. He stated that:

> based on Jeremy's extremely critical condition it would be reasonable to attempt to stabilize him before removing him from the ambulance as he is so critical

8

that moving him out of the ambulance might cause him to further decompensate.

This concept is increasingly being taught in EMS courses, and [it] recognizes that moving an extremely critical patient from the ambulance into the Emergency Department is enough to result in cardiac arrest and death.

As a result of this concept, it is not uncommon for EMS crews to arrive to a hospital and continue attending to the patient in the ambulance bay for 5-10 minutes while they attempt to further stabilize or "optimize" the patient.

Defendants also submitted the expert report of Michael D'Ambrosio, DO, a physician double-board certified in emergency medicine and neurology & vascular neurology. Dr. D'Ambrosio did not agree "that the paramedics deviated from the [standard of care] at any time in any of their actions."

## B.

Plaintiffs filed their complaint on November 21, 2018, naming as defendants: the Township of Union; the Township of Union Fire Department; the Township of Union Volunteer Ambulance Squad; Atlantic Ambulance Corp.; the Union Emergency Medical Unit, and several "John Does" and "ABC Companies." The complaint alleged Jeremy suffered permanent brain damage due to negligent, careless, reckless, willful, and wanton conduct by defendants.

9

On March 14, 2019, plaintiffs dismissed their claims without prejudice against the Union, the Union Township Fire Dept., and the Union Township Volunteer Ambulance Squad.

Defendant Atlantic Ambulance answered on April 1, 2019. After being granted leave, plaintiffs filed an amended complaint on March 11, 2020, adding as defendants: the BLS team (R. Iungerman and "John" Biedrzycki); the ALS team (David Pernell and Denyel Cusimano); Niti Sharma, M.D. the medical command physician on duty on the night in question; and her employer, AHS/Overlook Hospital. In their answers, defendants Pernell, Cusimano, Atlantic Ambulance, and AHS/Overlook each raised affirmative defenses, including "all statutory immunities" that may be applicable.

On February 24, 2022, the parties stipulated to the dismissal of Union Emergency, Robyn Iungerman, John Biedrzycki, and Niti Sharma, M.D. as defendants. The remaining defendants were paramedics Pernell and Cusimano, their employer Atlantic Ambulance, and AHS/Overlook Hospital.

After discovery, plaintiffs moved to strike the immunity defense. Defendants Pernell, Cusimano, and Atlantic Ambulance cross-moved for summary judgement on the grounds of paramedic immunity under N.J.S.A. 26:2K-14 and 29. The court granted defendants' motion for summary judgment,

10

making findings.[3]   Citing Frields v. St. Joseph's Hosp. & Med. Ctr., 305 N.J. Super. 244 (App. Div. 1997), the court found the paramedics were entitled to immunity under N.J.S.A. 26:2K-14 because "there are no facts considered in the light most favorable to [p]laintiffs that would support the argument that in attending to Jeremy's emergency needs, the paramedics acted in anything but good faith."  The court found summary judgment appropriate when the actions of the paramedics were either "objectively reasonable" or performed with subjective good faith.  The court stated, "even if reasonable minds could differ as to whether the actions taken by the paramedics were objectively reasonable, the court finds that the record establishes that the actions were undoubtedly performed with subjective good faith and that is enough to afford the paramedics immunity."  The court also found the paramedics acted in accordance with the statute.

On appeal, plaintiffs argue that the paramedics:  failed to provide advanced life support services; failed to provide advanced life support services in good faith; and failed to provide advanced life support services in accordance

---

[3]   Defendant AHS Hospital Corp./Overlook Hospital, improperly pled as Overlook Hospital, was granted summary judgment in its favor by the trial court on April 26, 2023.  That order is not on appeal before us.

with the statute. Finally, plaintiffs allege defendants were not entitled to immunity because the paramedics' actions were grossly negligent.

## II.

### A.

We review a trial court's summary judgment order de novo, applying the same standard used by the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). Rule 4:46-2(c) provides that a motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

### B.

We review matters of statutory interpretation de novo. Moschella v. Hackensack Meridian Jersey Shore Univ. Med. Ctr., 258 N.J. 110, 125 (2024). Our ultimate "task in statutory interpretation is to determine and effectuate the

Legislature's intent."  Bosland v. Warnock Dodge, Inc., 197 N.J. 543, 553 (2009).  Courts "look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen."  McGovern v. Rutgers, 211 N.J. 94, 108 (2012) (quoting Bosland, 197 N.J. at 553).  "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language."  DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citing Frugis v. Bracigliano, 177 N.J. 250, 280 (2003)).  Thus, any analysis to determine legislative intent begins with the statute's plain language.  Id. at 493.

## III.

For the first time on appeal, plaintiffs contend the paramedics were not providing advanced life support services. They contend "the [paramedics'] decision . . . to postpone Jeremy's delivery to the ER [and] intubate first . . . occurred prior to the performance of [advanced life support] service in question."  (emphasis added).  Plaintiffs submit N.J.S.A. 26:2K-14 must be interpreted narrowly, and "immunity is granted only for negligence while performing an ALS service." (emphasis added).

"[A]ppellate courts will decline to consider questions or issues not properly presented to the trial court . . . 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" Fuhrman v. Mailander, 466 N.J. Super. 572, 596 (App. Div. 2021) (alteration and omission in original). Jurisdiction is not at issue, however we conclude that defining the scope of immunity under N.J.S.A. 26:2K-14 is a matter of public interest which warrants discussion here.

We consider the language of the statute. N.J.S.A. 26:2K-14 of the Emergency Medical Services Act (the Act)[4] confers qualified immunity to certain classes of people who provide medical assistance to others. Frields, 305 N.J. Super. at 247. It states:

> No emergency medical technician, mobile intensive care paramedic, licensed physician, hospital or its board of trustees, officers and members of the medical staff, registered nurse, advanced practice nurse, physician assistant, or other employees of the hospital, first aid, ambulance or rescue squad, licensed emergency medical services agency, or officers and members of a first aid, ambulance or rescue squad shall be liable for any civil damages as the result of an act or the omission of an act committed while in training for or in the rendering of basic and advanced life support services in good faith and in accordance with this act.
>
> [N.J.S.A. 26:2K-14 (emphasis added).]

---

[4] N.J.S.A. 26:2K-1 to -74.

The Act defines the term "advanced life support services" as "an advanced level of emergency medical care, including specialty care transport, which includes basic life support functions and the use of procedures, medications, and equipment . . . paramedics . . . ." N.J.S.A. 26:2K-7(a).

We are unpersuaded by plaintiffs' attempt to isolate the decision to intubate from the act of intubation and argue that the decision itself falls outside the purview of the statute. Dr. Sharma, the medical command doctor, gave defendant paramedics authorization to intubate. After obtaining authorization, the paramedics' decision to intubate led directly to their act of intubation. We can safely say that the paramedics' act cannot exist without a corresponding decision in this context. We conclude that the paramedics' decision to intubate falls squarely within the meaning of "rendering . . . advanced life support services." N.J.S.A. 26:2K-14. We find no error here.

We next consider plaintiffs' argument that the paramedics did not provide their services "in good faith," and that we should evaluate their actions using an objective standard.

"'Good faith' has been defined as 'honesty of purpose and integrity of conduct without knowledge, either actual or sufficient to demand inquiry, that the conduct is wrong.'" Frields, 305 N.J. Super. at 248. "Summary judgment .

A-2968-22

. . is appropriate when the employee demonstrates that [their] actions 'were objectively reasonable or that [he] performed them with subjective good faith.'" Ibid. (quoting Canico v. Hurtado, 144 N.J. 361, 365 (1996)).

The trial court, applying Frields to the record, found the paramedics met their burden by showing they acted with subjective good faith pursuant to N.J.S.A. 26:2K-14.

We agree with Judge Alan G. Lesnewich's cogent and thorough analysis on the question, and we find it helpful to quote from Judge Lesnewich's statement of reasons:

> [Frields] clearly recognizes that even a mobile intensive care paramedic who acted negligently is entitled to qualified immunity, if he acted with subjective good faith or in a reasonably objective manner. Protection under the statute does not require flawless action. Nor does error deprive paramedics of immunity. Frields, 305 N.J. Super. at 248 (citation omitted). In this case there are no facts in the record that suggest that paramedics did not perform with good faith when treating Jeremy and transporting him to the hospital.

Finding that the paramedics acted in good faith, the trial court did not reach the issue of whether their actions were objectively reasonable.

Plaintiffs argue subjective good faith should not be the standard. They contend that Frields and Murray v. Plainfield Rescue Squad, 418 N.J. Super 574

16

(App. Div. 2011), rev'd on other grounds, 210 N.J. 581 (2012), which rearticulated the dual subjective/objective standard for immunity,[5] were wrongly decided. Plaintiffs urge us to "review the law pertaining to 'good faith' and bar the use of subjective good faith as a basis for paramedic immunity under N.J.S.A. 26:2K-14 and 29."

Frields adopted the objective/subjective standard from Canico. Canico considered whether a police officer was acting in good faith and therefore entitled to immunity under the New Jersey Tort Claims Act, N.J.S.A. 59:3-3. 144 N.J. at 362. Murray then adopted the interpretation used in Frields, adding "we consider it reasonable to look to the interpretation of [good faith] as it is used in describing the qualified immunity of public employees under N.J.S.A. 59:3-3." 418 N.J. Super. at 586.

Plaintiffs argue that we should interpret the qualified immunity for advanced life support paramedics under N.J.S.A. 26:2K-14 more narrowly than we interpreted the Tort Claims Act immunity in Frields and Murray. They cite

---

[5] Murray and Frields both considered immunity claims under N.J.S.A. 26:2K-29, which provides immunity to EMT intermediates. The language of N.J.S.A. 26:2K-29 is nearly identical to that of N.J.S.A. 26:2K-14, except that it applies to a slightly different class of emergency personnel and immunizes "intermediate life support services," rather than "advanced life support services."

A-2968-22

De Tarquino v. City of Jersey City, 352 N.J. Super. 450 (App. Div. 2002), in support of their proposition that principles of statutory construction and public policy call for "a more circumscribed reading" of the statute. We disagree.

In that matter, decedent, Tarquino, was transported to the hospital by paramedics after being assaulted by a police officer. Id. at 452. The paramedics omitted vital information in their written report, the "run sheet," which would have revealed symptoms of severe brain trauma. Id. at 452-53. The De Tarquino paramedics also placed misleading and incorrect data in the report. Id. at 453. After being prematurely released from the hospital, based in part on the false and misleading report of the paramedics, Tarquino later died from severe brain trauma. Ibid.

Judge Skilman wrote:

> All of the statutes providing qualified immunity for negligence in the rendering of emergency medical services are in derogation of common law negligence principles. "Where a statute alters the common law, the most circumscribed reading of it that achieves its purpose is the one that should be adopted." Application of this principle to statutes that confer immunity for negligence in rendering emergency medical services furthers this State's "tradition of giving 'narrow range' to statutes granting immunity from tort liability because they leave 'unredressed injury and loss resulting from wrongful conduct.'"
>
> [Id. at 455-56 (citations omitted).]

We concluded in <u>De Tarquino</u> that the paramedics' act of completing a run sheet did not fall within the scope of intermediate life support services for three reasons: first, completing a report did not require the same level of skill as administering medical care; second, filling out a report was not related to the paramedics' treatment plan; and finally, the run sheet was for the hospital staff's use in administering care. We held the paramedics were not entitled to immunity for negligence in completing a run sheet. <u>Id.</u> at 456.

<u>De Tarquino</u> is easily reconcilable with the record before us. The record before us describes the chaotic and pressure-packed events which took place between the paramedics' arrival at Jeremy's home and his eventual cardiac arrest in the hospital that night. The record from plaintiffs' perspective also shows the paramedics were not "flawless." That said, they were not engaged in the ministerial act of filling out a run sheet, nor did they omit vital data from their reports or mislead hospital personnel. The record shows that, at all relevant times, the paramedics were performing advanced life support services consistent with the statute.

In our view, the plain text of N.J.S.A. 26:2K-14, which immunizes acts taken by paramedics while rendering advanced life support services "in good faith," favors a subjective definition rather than a definition reliant on "objective

19

reasonableness," a phrase which does not appear in the statute. We are unconvinced that sound public policy warrants the narrow construction of N.J.S.A. 26:2K-14. Plaintiffs suggest the Legislature elected to condition immunity under both the Emergency Services Act and the Tort Claims Act on "good faith." The rationale for granting qualified immunity under either statute is the same, as neither police officers nor EMTs and paramedics should be "inhibited in performing [their duties] by fear of tort liability" when responding to emergencies. De Tarquino, 352 N.J. Super. at 456. We decline plaintiffs' invitation to construe first responder immunity more narrowly under the Emergency Services Act than under the Tort Claims Act.

Plaintiffs' third argument is that the paramedics failed to provide advanced life support services in accordance with N.J.S.A. 26:2K-14 and its corresponding regulations through a lack of proper voice communication with medical command and making additional intubation attempts rather than transport Jeremy into the ER. Plaintiffs submit that the Act and its regulations required the paramedics to call medical command when Jeremy's medical status, including his oxygen levels, took a turn for the worse during the ride to the hospital.

N.J.S.A. 26:2K-10 authorizes paramedics to perform advanced life support services, "if the paramedic maintains direct voice communication with and is taking orders from a licensed physician or physician directed registered professional nurse . . . ."

Here, the trial court properly found that the paramedics performed advanced life support services on Jeremy in accordance with the statute. The paramedics contacted their medical command twice and received permission to intubate Jeremy. Dr. Sharma's testimony makes clear that, when she authorized intubation, she was not authorizing a specific number of attempts. Plaintiffs cite no authority or standard to support the frequency with which paramedics must contact medical command, and N.J.S.A. 26:2K-14 does not define what it means to maintain direct voice communication.

Plaintiffs contend that immunity depends not only on acting in accordance with statutes, but also in accordance with regulations enacted to effectuate the Act. They argue the court's interpretation of the statute was flawed, and that it should have considered the legislature's intent to have the Commissioner of Health decide the scope of paramedic practice, which it did by adopting regulations found in N.J.A.C. 8:41-7 and -8. Plaintiffs argue that, because the regulations define how paramedics may practice, they are relevant to whether

21

the paramedics acted with good faith and whether they performed their services in accordance with the Act.

Here, the court examined the plain language of the statute and found it clear and unambiguous. See Matter of H.D., 241 N.J. 412, 418 (2020) (quoting Garden State Check Cashing Serv., Inc. v. Dep't of Banking & Ins., 237 N.J. 482, 489 (2019)) ("Where 'a statute's plain language is clear, we apply that plain meaning and end our inquiry.'"). "We will not 'rewrite a plainly written enactment of the Legislature [or] presume that the Legislature intended something other than that expressed by way of the plain language.'" Ibid. (citing State in Interest of K.O., 217 N.J. 83, 91-92 (2014)). We decline to use regulations to discern the Legislature's intent when the statute is clear.

The record shows plaintiffs' expert, Dr. Brown, agreed that direct voice communication does not mean a constant, live stream of communication. While responding to Jeremy's emergency, the paramedics relied on their authorization and instructions from medical command to intubate Jeremy when his breathing became difficult to manage. The trial court's determination that the paramedics were acting in accordance with the N.J.S.A. 26:2K-14 was not error.

Finally, plaintiffs argue that defendants' actions amounted to gross negligence, actions which were not immunized. Plaintiffs posit that the question

of whether the behavior of the paramedics rose to gross negligence is a question for the finder of fact. Citing their expert, Dr. Brown, plaintiffs argue the paramedics repeatedly deviated from the standard of care while treating Jeremy, and their actions were egregious enough to amount to gross negligence. Plaintiffs argue the court was obligated to view Dr. Brown's opinions in the light most favorable to them as the non-moving party, but instead the court "minimized" his opinions as "perceived" deviations from the standard of care and "alleged" violations of controlling guidelines. Plaintiffs cite Steinberg v. Sahara Sam's Oasis LLC, 226 N.J. 344, 142 (2016), as support for their argument that safety code and regulatory violations can give rise to gross negligence.

Gross negligence is "a higher degree of negligence" and "undoubtedly denotes 'the upper reaches of negligence conduct.'" Steinberg, 226 N.J. at 364 (quoting Parks v. Pep Boys, 282 N.J. Super. 1, 17 n.6 (App. Div. 1995)). "Whereas negligence is 'the failure to exercise ordinary or reasonable care' that leads to a natural and probable injury, gross negligence is 'the failure to exercise slight care or diligence.'" Ibid. (quoting Model Jury Charge (Civil), 5.12, "Gross Negligence" (2009)). "Although gross negligence is something more than 'inattention' or 'mistaken judgment,' it does not require willful or wanton misconduct or recklessness." Ibid.

A-2968-22

Here, the extensive record, viewed in the light most favorable to plaintiffs, does not support a finding of gross negligence. The paramedics had authorization to intubate from their medical command, who testified she did not consider her authorization to be limited to a certain number of attempts, and that she generally trusts the judgement of paramedics because they are able to directly observe and assess the patient. While the record shows an unscheduled stop on the way to the hospital to retrieve a pediatric pulse oximeter, the paramedics' failure to securely attach Jeremy's breathing and intubation apparatus while transiting from the ambulance to the hospital, and the presence of the intubation device in Jeremy's esophagus rather than his trachea—we discern nothing which could be characterized as "the failure to exercise slight care or diligence," rising to gross negligence. Steinberg, 226 N.J. at 364.

Any contentions raised by plaintiffs on appeal not addressed here lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2968-22