NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0183-24

DAVID TIMPANARO,
individually and as Executor
and Administrator Ad
Prosequendum of the ESTATE
of ANTHONY J. TIMPANARO,
LIA TIMPANARO, individually
and as guardian of minor, C.T.,

     Plaintiffs-Appellants,

v.

JENKINSON'S PAVILION,
INC., a corporation of the State
of New Jersey, and JENKINSON'S
SOUTH, INC., a corporation
of the State of New Jersey,

     Defendants-Respondents.

_____

> **APPROVED FOR PUBLICATION**
> **November 21, 2025**
> **APPELLATE DIVISION**

Argued October 20, 2025 – Decided November 21, 2025

Before Judges Sabatino, Walcott-Henderson and Bergman (Judge Sabatino concurring).

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1110-21.

Timothy J. Foley argued the cause for appellants (Sarno Da Costa D'Aniello Maceri, LLC, and Foley & Foley, attorneys; Cynthia A. Walters and Paul da Costa, on the briefs).

Michael C. Corcoran argued the cause for respondents (Murphy Sanchez, PLLC, attorneys; Dennis M. Marconi and Michael C. Corcoran, on the brief).

The opinion of the court was delivered by

WALCOTT-HENDERSON, J.A.D.

In this tragic drowning case, plaintiffs David and Lia Timpanaro[1] appeal from an order granting summary judgment in favor of defendants Jenkinson's Pavilion and Jenkinson's South,[2] resulting in the dismissal of their wrongful death and premises liability complaint under the immunities afforded by the Landowner's Liability Act ("LLA"), N.J.S.A 2A:42A-2 to -10, and on other grounds.[3] Plaintiffs argue the court erroneously held defendants' commercial boardwalk business and abutting beach operations bear no responsibility for monitoring, warning, or protecting business invitees from life-threatening ocean conditions present for more than three days before decedent's death. Plaintiffs also appeal from an order denying their subsequent motion for

---

[1] Because plaintiffs share a surname, we refer to them individually by their first names, intending no disrespect.

[2] We refer to "Jenkinson's Boardwalk," "Jenkinson's Pavilion," "JSouth," and "JPav" collectively as "defendants" consistent with their briefs.

[3] Defendants' property is divided into two areas: JSouth and JPav, which share branding as "Jenkinson's Boardwalk" although they are separate and distinct entities, they are owned by the same family.

A-0183-24

reconsideration. For the reasons that follow, we affirm, although we do not rest on LLA immunity to sustain the result.

I.

The essential facts are undisputed. On September 23, 2020, plaintiffs, accompanied by their minor child, C.T., and then sixty-nine-year-old father and grandfather, Anthony Timpanaro ("decedent"), traveled to defendants' beachfront property to spend the day. By all accounts, it was a beautiful September day after the hustle and bustle of the summer season.

On arrival, the family met at Jenkinson's South's ("JSouth") parking lot behind the arcade area because "that particular corner and location had everything, pizza, the arcade and had sand." Linda Pulitano, a beach attendant, collected a parking fee and explained the beach was closed for swimming but that one gate remained open and advised the family to "[f]eel free to go on the beach and walk and play." Because it was the end of the summer season, there were no lifeguards on duty.

The family made their way onto the beach where they settled into beach chairs and decedent and his grandson began searching for seashells and chasing seagulls. Plaintiffs admit they observed three large signs on the property: one advertising the boardwalk, beach, arcade games and rides; another which conveyed that the "beach was closed[,] [n]o swimming"; and

A-0183-24

another stating "no swimming when lifeguards are off-duty."

At some point, decedent joined Lia and C.T. at the water's edge. He was not wearing shoes and had the legs of his pants "rolled up a little." According to Lia, a wave came in while they were standing on wet sand and "it was stronger than [she] thought it would have been. And [her] feet [sank] in and [she] teetered with the wave and stepped back. [Decedent] also teetered with the wave and stepped back, and then lost his balance." Another wave engulfed decedent, prompting David to venture into the water to pick him up and the next thing she knew, decedent was out in the ocean yelling for help. Lia called 9-1-1 and went to the boardwalk area to help direct first responders to the area where the decedent had been hit by the wave. When she returned with the emergency personnel, decedent was back on the beach facedown. He died after all efforts to revive him failed.

In May 2021, plaintiffs sued defendants in a three-count complaint, alleging: (1) wrongful death; (2) survivorship, including allegations of negligence, recklessness, gross negligence, and willful, malicious, and/or wanton conduct by the defendants' entities and their employees, resulting in severe and extreme physical and emotional pain, suffering, and anguish endured by decedent before and during his death and as he attempted to escape the ocean water; and (3) negligent infliction of emotional distress.

A-0183-24

<u>The Beach Area and Associated Permit</u>

Relevant to this case, Point Pleasant Beach is separated from the boardwalk by a wooden sea wall, with access limited to sliding steel gates and ramps controlled by gate attendants during the season. The boardwalk area has numerous food vendors, rides, and "other amusements," which are open year-round. Jenkinson's off-season businesses include "an amusement park, indoor and outdoor arcades, stores, restaurants, food service establishments, bar, nightclub, indoor aquarium, and miniature golf complex."

Defendants applied for and were granted a Coastal Area Facility Review Act ("CAFRA") IP permit in October 2018 under the Rules on Coastal Zone Management ("CZM"), N.J.S.A. 7:7-1.1.[4] The permit further impose several "special conditions," including that defendants "cannot limit vertical or horizontal public access to its dry sand beach area nor interfere with the public's right to free use of the dry sand for intermittent recreational purposes connected with the ocean and wet sand."

Following plaintiffs' complaint, a period of discovery ensued, including deposition testimony from the New Jersey Department of Environmental Protection ("DEP"), defendants' employees and plaintiffs' and defendants'

---

[4] The permit authorized "the construction of a shore protection project consisting of a seawall, rock revetment, boardwalk modifications, three vehicle access ramps, eight pedestrian accessways and beach berm maintenance."

experts.   Vivian Fanelli, DEP's representative and environmental specialist, agreed DEP permits do not allow defendants to limit vertical or horizontal public access to the dry sand beaches and defendants must maintain public access.   DEP's Region Supervisor, Robert Clark, also testified that defendants, like all permitees, must comply with all conditions of a permit, there are no time limitations, and the permit conditions are in effect year-round.

The key site manager and part-owner of JSouth and JPav, P.J. Storino, testified at deposition that he recounted watching weather reports daily to track incoming storms and confirmed that he would review National Oceanic and Atmospheric Administration ("NOAA") warnings and advisories "periodically."   He denied being aware of any storm event towards the end of 2020 that would include the time-frame during which decedent drowned.

The Settlement Agreement and Manual

In addition to the DEP permits as discussed above, defendants were also required to comply with the terms of a 2017 settlement agreement with the DEP, which required preparation of an Operation and Maintenance manual ("Manual") for the sea wall and beach berm.   Under the settlement agreement, defendants were required to inspect the bulkhead, "secure all openings in the

6                                                          A-0183-24

bulkhead at beach access locations prior to a significant [s]torm [e]vent,"[5] and "deploy all flood gates at the openings in the seawall prior to a [s]ignificant [s]torm [e]vent in accordance with the [s]ignificant [s]torm [e]vent [a]ction [p]lan."

Pursuant to the Manual, "a significant storm event" is designated if Jenkinson's Boardwalk (1) is within a tropical storm or hurricane watch or warning area, as determined by the National Hurricane Center; (2) within a National Weather Service ("NWS") coastal flood warning area, provided a surge of at least three feet is predicted to occur at the Watson Creek Station of the Stevens Flood Advisory System; or (3) within an area of a state of emergency for storm or flooding as issued by the Governor's Office.

Additionally, prior to any significant storm event, defendants' operator "shall consult" with the DEP Division of Coastal Engineering to coordinate the timing of floor gate closure. If contact with DEP cannot be made, the operator "shall close all flood gates within [three] hours of the declaration of any of the above-referenced criteria." Also, during a potential significant storm event, the key site manager must: (1) identify the significant storm event declaration; (2) notify the DEP, Borough, and the Jenkinson's engineer; (3) consult with the

---

[5] The agreement further specified "[t]he criteria for determining the existence of a [s]ignificant [s]torm [e]vent, and the appropriate response shall be defined in the [Manual], with reference to forecasts of the [NWS] and [NOAA]."

A-0183-24

DEP "to coordinate the timing of flood gate closure, if required;" (4) "[c]lear the beach of all people and closing the access of the beach to the public;" (5) "[l]ock the gates to prevent opening during the storm;" (6) "periodically check the gates, people on the beach and seawall during the storm event" provided safety allows; (7) open the gates after expiration of the event; and (8) direct the Jenkinson's engineer to conduct a post-storm inspection of the seawall if storm surge and/or waves reached the seawall during the significant storm event.[6]

Point Pleasant Ordinance 2020-12

During discovery, the parties stipulated that the Borough of Point Pleasant Ordinance 2020-12 ("Ordinance") was in effect at the time of the drowning. The Ordinance expressly provides that during the summer season all beaches "shall" close at 7:00 p.m. See Point Pleasant, N.J., Ordinance 2020-21 (Aug. 4, 2020). It is undisputed the Ordinance includes exceptions for members of the public who wish to surf, fish, or scuba dive while the beach is closed and members of the public who wish to exercise on the wet sand or in

---

[6] The Manual further provided that in the event of a significant storm event, the flood barriers must be deployed and a post-storm seawall inspection conducted. Once the flood barriers are closed, the gates must remain closed "until the significant storm event has ended, which will be at least [twelve] hours after the closing of the gates, or earlier upon consultation with [DEP]."

A-0183-24

the ocean.

Defendants' employee Dean Albanese, lifeguard chief at Jenkinson's, was also deposed. He testified that there is a difference between in-season and off-season protocols and that sometime after Labor Day every year, the beach closes for the season and all lifeguard equipment is brought inside and no more lifeguards remain on duty. According to Albanese, lifeguard equipment is present during the in-season, with permanent water condition signs posted and colored flags communicated to beachgoers. During the off-season, on the other hand, lifeguard staff is furloughed, and the only generally left up signs are

BEACHES CLOSED
NO SWIMMING

at entry points and red flags on some flagpoles. He noted that at that time "beach closed" and "no swimming" signs are put up. He confirmed that on September 23, the lifeguards were no longer on duty but were instead working to close the beach for the season and noted that there were numerous "beach close" and "no swimming signs" in addition to a red flag on the flagpole. He admitted there were no signs explaining the meaning of the red flagpole because the signs had been removed since it was the end of the season.

John Chernosky, a lifeguard captain, was also deposed and testified he had worked for defendants as a lifeguard since 2004. Chernosky described his

9

duties as: "diagnos[ing] the water for flag conditions" and conveying the tides and temperature information to his colleagues. On the day of the accident, Chernosky was working the beach cleanup crew when a coworker received a call from Albanese "stat[ing] something to the effect that there was a possible downing by Arnold Ave[nue]." Chernosky and others ran down the boardwalk where they met the police on the scene. He confirmed no lifeguards were on duty on the day of the accident, as they "were doing maintenance."

Expert Reports and Deposition Testimony

Defendants' expert, James Cresbaugh, prepared a report in which he opined defendants "did not breach any standard of care in the manner that beach operations were handled on September 23, 2020," nor did they "breach any duty and/or standard of care owed to the plaintiffs." He stated:

> When the bathing season has concluded and there are no employees, there is no responsibility for providing beachgoers water safety should they decide to enter the water. [Defendants] allow[] beach access after the season for those who wish to make use of the beach and thus allows for beachgoers to walk across the beach to reach the Atlantic Ocean, which is always accessible to anyone wishing to use the ocean for their pleasure, as per the Public Trust Doctrine.

Cresbaugh emphasized "there was no one employed as lifeguards or supervisors once bathing season ended," consistent with the industry standard for all New Jersey beaches and no lifeguard stands or lifeguard equipment

10

could be seen on the beach. He noted defendants posted large signs indicating the beach was closed and swimming should not be considered because no lifeguards were on duty and a red flag was flying from a nearby flagpole.

According to Cresbaugh, "beach patrols do not monitor or respond to any storm-related warnings or hurricane alerts after the beaches have closed for the season, as the summer staff have moved on to their winter activities." He also cited the Public Trust Doctrine and DEP permits afforded to defendants and concluded defendants' permits "do not contain any language limiting horizontal and vertical access to the ocean [and,] does not allow [defendants] to deny access to the Atlantic Ocean once the beach closes for the season." In his view, industry standards "clearly hold that there is a responsibility of reasonable care to provide beach users with beach access."

By contrast, plaintiffs' expert, Bruckner Chase, a beach and coastal hazards consultant to NOAA and its subsidiary NWS, with extensive beach/facility/lifeguard experience, including preventive safety, provided two reports and deposition testimony. In his initial report, Chase concluded that "[b]oth high coastal waters and large surf were forecasted by the [hurricane center] during the time frame of the incident." In his opinion, defendants "were negligent, grossly negligent and reckless in not closing the seawall gate as an added layer of protection from the known public health and safety

11

conditions existing on the shore at the time of the incident," and in failing to provide clear and consistent messaging on their beach open or closed status based on he characterized as the unclear meaning of its "BEACHES CLOSED" signs.

In his second expert report, Chase asserted defendants engaged in "a reckless disregard to ensure patron safety when they knew or should have known of dangerous and life-threatening conditions present because they failed to adequately monitor national weather and coastal warnings."

Summary Judgment

Following discovery, defendants moved for summary judgment, arguing: (1) they are immune from any liability stemming from decedent's death pursuant to the LLA; (2) they owed no duty to monitor the ocean or warn of dangerous ocean conditions during the off season beyond posting signs; and (3) had a legal duty to keep their beach premises open per DEP permits, and so plaintiffs could not demonstrate a breach of duty based on the decision to keep the premises open.

Plaintiffs opposed summary judgment and cross-moved to bar defendants from producing expert testimony opining on the duty of care required for business invitees, arguing: (1) defendants are not protected from liability under the LLA as the property is not the type of property

A-0183-24

contemplated by the Act; and (2) even if the LLA applies, defendants remain liable for "willful or malicious failure to warn the public against the latent dangerous condition that was the ocean at the time of [d]ecedent's drowning."

The Trial Court's Decision

The court granted summary judgment in favor of defendants and issued a comprehensive twenty-one-page written statement of reasons. The court first considered whether defendants are immune under the LLA and explained:

> [d]ue to its unique form and untamable nature[,] the [LLA] applies to the ocean. The [LLA] requires its language to be applied literally. N.J.S.A. 2A:42A-5.1. The ocean cannot be rendered safe for "sport or recreation." Further[,] its nature prevents it from being identified as improved land and certainly [it] is in a "natural condition."

The court further concluded "[t]o hold a landowner responsible for the death of someone who observed warning signs and opted to enter the ocean is exactly the type of circumstances the [LLA] is intended to prevent," and "it should be noted that one of the central ideas of the [LLA] is that a landowner should not be held liable for the public's use of a property which cannot be defended from trespassers or readily accessed by rescuers." The court next found "it is uncontested that no lifeguards were present when [p]laintiffs visited defendants' beach," they were not invited to enter the ocean, which was "a severable part of [d]efendants' property due to the starkly different nature of

the ocean versus the beach."  The court explained that N.J.S.A. 2A:42A-8 makes clear that the LLA applies, in that it states that liability is limited if public access has been required by the DEP.

Apart from the LLA immunity analysis, the court rejected plaintiffs' argument they were business invitees to the ocean and defendants had a duty to render the premises reasonably safe, concluding the ocean cannot be made safe.  The court concluded

> as no conditions that would require [d]efendants to restrict public access to the beach were in effect on the date of [d]ecedent's drowning and [d]efendants had a legal obligation to maintain public access to the beach [,] plaintiffs' assertions that they could have closed the beach entrance or otherwise barred public access . . . to prevent access during dangerous conditions are unsubstantiated.

The court further concluded defendants had a duty to warn invitees of potentially dangerous conditions, but fulfilled that duty with their signage warning the public not to swim when lifeguards are not present and that the beach was closed.  Plaintiffs therefore cannot prevail as a matter of law because they cannot prove defendants breached a duty of care.

Plaintiffs moved for reconsideration under Rule 4:49-2, arguing the court erred by overlooking and misinterpreting material issues of fact and in determining the LLA applied to immunize defendants.  In denying the motion for reconsideration, the court clarified a key fact, stating "the [c]ourt does not

14

see a material difference between a person standing on the beach at the water's edge in the face of an approaching tide, . . . and then being swept away from a wave as opposed to walking into the water and then being swept away from a wave." The court concluded that although "certain ocean conditions were acknowledged, no hurricane watch or warning was declared by [NOAA] . . . [d]efendants' beach premises were never identified as being part of a [c]oastal [f]lood [w]arning area nor had the Governor's Office issued a State of Emergency for [s]torm or [f]looding." Thus, the court held that defendants had no duty to deploy the floodgates and to close the beaches pursuant to their 2017 settlement with DEP.

This appeal followed.

## II.

On appeal, plaintiffs argue the court erred by: (1) holding defendants did not violate their duty to plaintiffs as a matter of law; (2) relying on factual errors, including that decedent was in the water when he was struck by the waves; and (3) applying the LLA immunity to defendants.

More particularly, plaintiffs maintain "[t]here can be little dispute [they] were business invitees as they went to JSouth's beach/amusement venue for its business purpose, paid to park. . . . Although they paid no specific beach entry fee (due to the off-season), the beach was nonetheless part of the overall

15

A-0183-24

business operation and used as an economic draw . . . making them economically interdependent." They argue, the court erred in determining decedent exceeded the scope of his invitation by voluntarily entering the ocean, a fact unsupported by evidence and established only by "judicial fiat" when "the evidence was that [d]ecedent remained on the beach before he was swept away by sudden dangerous hurricane related waves." Although plaintiffs later acknowledged, in its decision on reconsideration, the court clarified that it was cognizant of the fact decedent was not in the ocean at the time of the incident, but determined "he was 'within the ocean's influence,' which it viewed as equivalent to voluntarily entering the water."

Plaintiffs next argue the court erred in holding defendants were not permitted to close the JSouth gates by overlooking the fact that the permit language does not "eliminate obligations for public safety—even when public access is required."

With respect to the court's application of immunity under the LLA, plaintiffs' aver the consideration paid for the parking fee "should have ended the discussion since consideration, albeit nominal, was paid" and even if the parking fee alone did not qualify as consideration, "the fact that [p]laintiffs planned to spend money at the boardwalk . . . should nonetheless establish the consideration necessary to preclude an immunity claim under the LLA."

16

Furthermore, they contend JSouth is not the type of premises to which the LLA immunity applies because the beach and businesses do not constitute "premises" within the meaning of the LLA. Relying on Harrison v. Middlesex Water Company, 80 N.J. 391, 397-99 (1979), plaintiffs maintain the LLA immunity has been held to apply to protect owners of large tracts or areas of natural and undeveloped lands, and "JSouth's beach is developed and part of a year-round entertainment complex." Lastly, plaintiffs maintain the LLA immunity does not preclude claims for grossly negligent, willful or malicious conduct, a point which was not addressed by the court.

III.

We review the disposition of a summary judgment motion de novo, applying the same standard used by the motion judge. Townsend v. Pierre, 221 N.J. 36, 59 (2015). Like the motion judge, we view "the competent evidential materials presented . . . in the light most favorable to the non-moving party, [and determine whether they] are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Town of Kearny v. Brandt, 214 N.J. 76, 91 (2013) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)); see also R. 4:46-2(c).

"To decide whether a genuine issue of material fact exists, the trial court

17

must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 450, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

In addition, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995).

## A.

### (Alleged LLA Immunity)

"To sustain a cause of action for negligence, a plaintiff must establish four elements: '(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages.'" Townsend, 221 N.J. at 51 (internal quotation marks omitted) (quoting Polzo v. Cnty. of Essex, 196 N.J. 569, 584 (2008)). The LLA, however, provides that certain owners, lessees, and occupants of

A-0183-24

property do not owe a duty to plaintiffs injured while using such property for recreational activities and are therefore immune to suit. N.J.S.A. 2A:42A-3.[7]

Specifically, the LLA provides:

> An owner, lessee, or occupant of premises, whether or not posted as provided in section 23:7-7 of the Revised Statutes, and whether or not improved or maintained in a natural condition, or used as part of a commercial enterprise, owes no duty to keep the premises safe for entry or use by others for sport and recreational activities, or to give warning of any hazardous condition of the land or in connection with the use of any structure or by reason of any activity on such premises to persons entering for such purposes.
>
> [N.J.S.A. 2A:42A-3(a).]

This immunity is available to public entities as well as private ones. Trimblett v. State, 156 N.J. Super. 291, 295 (App. Div. 1977). The LLA further provides that it "shall be liberally construed to serve as an inducement to the owners, lessees, and occupants of property, that might otherwise be reluctant to do so for fear of liability, to permit persons to come onto their property for sport and recreational activities." N.J.S.A. 2A:42A-5.1. The LLA's limitations on liability apply to several types of landowners, including

---

[7] The LLA defines "sport and recreational activities" to include "hunting, fishing, trapping, horseback riding, training of dogs, hiking, camping, picnicking, swimming, skating, skiing, sledding, tobogganing, operating or riding snowmobiles, all-terrain vehicles or dirt bikes, and any other outdoor sport, game and recreational activity including practice and instruction in any thereof." N.J.S.A. 2A:42A-2.

commercial landowners who have agreements with the DEP requiring public access on or across their properties, so long as they do not act in a willful or malicious manner, or charge a fee to individuals to engage in recreational activities. N.J.S.A. 2A:42A-8.

At its core, the LLA encourages landowners to make their properties available for sport and recreational activities by limiting the tort liability that landowners might otherwise be subject to under the common law. The LLA provides that a "landowner" owes no special duty to keep its property safe for entry or use by others for sport and recreational activities. It further provides that landowners owe no duty to warn persons entering the property of any hazardous conditions of the land. N.J.S.A. 2A:42A-3.

Here, plaintiffs argue exceptions to LLA immunity apply, asserting: first, that defendants exercise complete control over access to the beach, contrary to the policy for which LLA immunity was created; and second, the subject property is suburban and not a rural or semi-rural premises as contemplated by the LLA. In applying the LLA, the motion court framed the issue as one predicated on defendants' ownership of the beach and "the idea that a landowner should not be held liable for the public's use of a property which cannot be defended from trespassers or readily accessed by rescuers." Based on our de novo review, we part ways with the court's conclusion the

LLA immunity applies to shield defendants from liability.

In reaching this determination, we consider the express language of the LLA and case law interpreting its provisions.  When interpreting the language of a statute, a reviewing court "aims to effectuate the Legislature's intent." Conforti v. Cnty. of Ocean, 255 N.J. 142, 163 (2023) (quoting W.S. v. Hildreth, 252 N.J. 506, 518 (2023)).  Because "[t]here is no more persuasive evidence of legislative intent than the words by which the Legislature undertook to express its purpose," the court "first look[s] to the plain language of the statute."  Ibid. (first alteration in original) (quoting Perez v. Zagami, LLC, 218 N.J. 202, 209-10 (2014)).  The court must "ascribe[] to the statutory words their ordinary meaning and significance and read[] them in context with related provisions so as to give sense to the legislation as a whole."  Ibid. (alterations in original) (quoting Hildreth, 252 N.J. at 518).

Our Supreme Court's ruling in Harrison v. Middlesex Water Co., addressed the applicability of the LLA in another tragic drowning case involving a decedent who attempted to rescue two boys who had fallen through the ice while skating.  80 N.J. at 394-96.  The defendant in Harrison owned a 136-acre property, which contained a ninety-four-acre reservoir and forty-two acres of surrounding land, "situated in an area zoned for residential use" that had "become heavily populated," with the property itself "bounded by a

regional high school, several athletic fields, a tennis court, two social clubs and a number of private homes whose rear lots extend[ed] almost to the edge of the lake." Id. at 394. "The greater part of [the] property [was] unfenced, with the result that the lands ha[d] been openly accessible to and used freely and frequently by the public." Ibid. The defendant claimed immunity under the LLA; however, our Court was not persuaded.

Significantly, the Court declined in Harrison to grant the LLA "a broad application," rejecting any interpretation that would "immuniz[e] . . . all landholders from liability for injuries incurred during the course of outdoor recreational activity on their property, particularly with respect to improved lands freely used by the general public located in populated neighborhoods in urban or suburban areas." Ibid. Instead, the Court held that when considering a grant of immunity under the LLA, a court must consider "the use for which the land is zoned, the nature of the community in which it is located, its relative isolation from densely populated neighborhoods, [and] its general accessibility to the public at large." Ibid. The Court determined the defendant's property, "an improved tract situated in a highly populated suburban community . . . [and] surrounded by both private homes as well as public recreational facilities," was "unlike lands located in rural or woodland reaches where the activities of people thereon cannot be supervised or

22

controlled and where the burden of guarding against intermittent trespassers may far outweigh any risk to such persons and presence of such persons may be difficult to foresee and contain." Id. at 401-02. The Court concluded the defendant in Harrison was not entitled to immunity under the LLA. Id. at 402.

We are satisfied based on the express language of the LLA and the predominant theme of our case law interpreting the LLA that the motion court erred here in concluding defendants were immune from liability, as the LLA does not apply to the ocean where the decedent drowned. Harrison makes clear that our Court declined to grant the LLA such a "broad application."

In light of Harrison, we conclude the ocean which claimed the life of decedent was not an area intended to be covered under the LLA. Defendants are not owners or lessors of the ocean.

Moreover, even if we were to regard defendants as lessors of the beach, we are not convinced the beach is the type of rural landscape whose owners are typically entitled to immunity under the LLA. The beach is not located in a rural area. It remains openly accessible to and used freely and frequently by the public under the Public Access Doctrine, which recognizes that the ownership, dominion, and sovereignty over certain natural resources "is vested in the State in trust for the people." Matthews v. Bay Head Improvement

23

Ass'n, 95 N.J. 306, 312 (1984).[8]

We also decline to rest our LLA analysis on the fact that defendants charged a parking fee. The LLA can apply to "commercial enterprises," and the fee was not charged for engaging in a "recreational activity." N.J.S.A. 2A:42A-3(a).

## B.

### (Business Invitees)

We next turn to plaintiffs' argument the court erred in holding defendants did not violate the duty owed to them as "business invitees as they went to JSouth's beach/amusement venue for its business purpose." In making this argument, plaintiffs acknowledge the court agreed they were business invitees. They next argue, the court "erred in determining decedent exceeded the scope of his business invitation when he 'voluntarily' enter[ed] the ocean" even though they acknowledged the court clarified that decedent did not voluntarily enter the ocean in its reconsideration decision. Plaintiffs further contend the court ignored the "wide swath of damp sand along the water's

---

[8] In 2019, the Public Trust Doctrine was codified as N.J.S.A. 13:1D-150(b). Although, "[t]he public's right to access tidal waters and their adjoining shorelines, while substantial, is not unlimited," the circumstances limiting access are typically "necessary for" public health and safety. This could include prohibitions on surfing immediately after a major storm, nighttime swimming and other similar activities." Ibid.

edge," and points to the absence of any evidence "[p]laintiffs understood hurricane related ocean conditions were present or that walking along wet sand near the water's edge presented dangers." Plaintiffs' arguments on this point are without merit.

As the court explained in its reconsideration decision, decedent was an invitee onto the beach, not the ocean, as he was specifically advised that no swimming was permitted. Nevertheless, the court appropriately found significant that "[d]ecedent voluntarily approached the water's edge in the face of an approaching tide and was swept into the ocean," rolled up his pants, took off his shoes, and walked onto wet sand, and concluded, he "clearly put himself within reach of the ocean and its waves."

We further agree with the court that although its view of the facts may differ from plaintiffs, there is no evidence to suggest the court failed to appreciate the legal significance of probative, competent evidence.

C.

(The Alleged Duty to Close the Beach)

Having established the public's and plaintiffs' right to access the beach, we now address whether there were conditions warranting closure of the beach or should have precluded access on the day of decedent's drowning.

Based on this record, we are hard-pressed to conclude that there were

A-0183-24

atmospheric or weather-related conditions necessitating the closure of the beach. We reach this determination based on the following undisputed facts: the beach area in question is owned and operated by defendants; plaintiffs and decedent alighted onto the beach area during the off-season at a time when defendants had no duty to provide lifeguards; there were signs posted on the beach, including at least one red flag warning the public that the beach area was closed for swimming; plaintiffs and decedent were permitted to access the beach but advised not to swim; and it was a beautiful beach day, without any indication of inclement weather or rough surf.

The key issue in dispute on this point is whether, as plaintiffs contend, defendants had a duty to close the beach because of the presence of a "significant storm event" as defined in the Manual prepared in compliance with the 2017 DEP settlement. We are not persuaded such a duty existed on that day.

In support of their argument, plaintiffs aver that defendants had a duty to warn them of Hurricane Teddy; "one of the four largest Atlantic Hurricanes on record," which had formed on September 12, eleven days prior to decedent's death. They argue defendants had at least constructive notice of the dangers because "the particular condition existed for such [a] period of time that an owner . . . in the exercise of reasonable care should have discovered its

26

existence." However, the record is clear: there were no hurricane watches or warnings declared by NOAA and as the court noted, Point Pleasant premises were never identified as being part of a coastal flood warning area, nor had the Governor issued a state of emergency for storms or flooding. Thus, plaintiffs cannot establish the presence of any conditions triggering the closure of defendants' beaches.

Plaintiffs' argument that dangerous conditions persisted following the passage of a hurricane at least one week before the day of decedent's drowning does not satisfy the definition of a "significant storm event" as defined in the Manual, as the area was not "within a tropical storm, hurricane watch or warning." There was no evidence showing the boardwalk was within an area where a surge of at least three feet of water was predicted, and the Governor had not declared a state of emergency. We therefore reject plaintiffs' unsupported assertions and conclude defendants had no duty to close their beaches.

D.

(Signage)

Plaintiffs further dispute the adequacy of the signage on the beach that warned:

BEACHES CLOSED
NO SWIMMING

27

Plaintiffs stated that "not a single witness testified the sign meant the beach was actually closed." Additionally, plaintiffs assert the red flag at the entrance to the beach was insufficient to warn visitors not to swim or wade, when presented without the attendant explanatory sign that is only present in-season.

Plaintiffs' expert argued defendants were "grossly negligent in failing to provide clear and consistent messaging on their beach open or closed status, and this put patrons in danger who would visit the beach with no knowledge of the dangers inherent in any beach environment at any time." And, "the unclear meaning of [BEACHES CLOSED] allowed visitors to unknowingly put themselves at risk by entering an apparently open beach area with dangerous conditions."

Although not specifically addressed in a separate section of its opinion, the court incorporated the defendants' use of signage—clearly warning the public that the beaches were closed to swimming and that no lifeguards were on duty—into its analysis of the defendants' argument that plaintiffs were not business invitees to the ocean and, consequently, that defendants owed no duty to monitor ocean conditions.

The record reflects that defendants had prominently displayed signs in both the parking area and on the beach, advising that swimming was prohibited and beaches were closed. Plaintiffs do not dispute encountering signage

28

bearing the message, "NO SWIMMING WHEN LIFEGUARDS ARE OFF-DUTY," upon exiting the parking lot, in addition to at least one other sign in the vicinity where they set up their chairs, stating "BEACHES CLOSED" and "NO SWIMMING." David, in particular testified he observed a sign that said "no swimming . . . when lifeguard is not on duty" in the area where they parked and another sign saying (as he recalled it) "beach closed for swimming." Further, two red flags were hung above the beach entrance used by plaintiffs.

We recognize that the "BEACHES CLOSED" and "NO SWIMMING" sign may be confusing to patrons as to whether the beach was indeed closed in addition to prohibiting swimming. In this case, however, Lia testified she understood the beach was not closed to visitors but rather closed only for swimming. This testimony is consistent with the information provided to plaintiffs by defendants' parking attendant. Further, plaintiffs maintain they and decedent did not intend to swim, thereby undercutting their claim that the signs were misleading because they actually understood the beach was open, although not for swimming.

The court acknowledged that these measures undertaken by defendants to warn the public about hidden dangers sufficiently fulfilled their duty of

29

A-0183-24

care.  In our de novo review of defendants' motion, we therefore discuss this important issue in greater detail here.

Allowing plaintiffs all reasonable inferences, and accepting their claim that they did not notice the red flags displayed above the entrance to defendants' property, we nonetheless reach the manifest conclusion that plaintiffs were unequivocally aware that swimming was prohibited and that no lifeguards were present.  As the court astutely observed, "[t]hese warnings do not explicitly tell potential swimmers that the waters are dangerous because a reasonable person can recognize that the ocean is dangerous twelve months a year."  Nevertheless, the warnings unmistakably convey to beachgoers that no lifeguards were on duty should they encounter difficulties in the water.  Therefore, we remain unconvinced by plaintiffs' arguments, and conclude that defendants were properly entitled to summary judgment as no genuine issue of material fact exist about the adequacy of the warnings.

E.

(Alleged Factual Errors)

Having concluded defendants had no duty to close the beach, we next turn to plaintiffs' argument the court relied on factual errors by specifically finding that the decedent was in the water when he was struck by the wave and carried out into the ocean. We owe no deference to the court's summary

A-0183-24

judgment findings that are not supported by the record. <u>Horne v. Edwards</u>, 477 N.J. Super. 302, 312 (App. Div. 2023), <u>certif. denied</u>, 256 N.J. 439 (2024) (citing <u>Rova Farms</u>, 65 N.J. at 484).

Although the court, in part, based its initial grant of summary judgment, on this apparently incorrect fact, the court clarified its holding in its reconsideration decision, stating: "[t]he [court] is cognizant of the fact that while standing on the beach <u>at the water's edge</u>, decedent was knocked off balance by an ocean wave from the ocean's incoming tide and was pulled into the ocean." (emphasis added). The court therefore clarified its ruling when it explained "[t]he [decedent] clearly put himself <u>within reach of the ocean and its waves</u>. For all practical purposes it was [d]ecedent's decision <u>to approach the water</u> that resulted in him being swept into the ocean." (emphasis added).

The court soundly concluded defendants were entitled to judgment as a matter of law, based on its finding that decedent exceeded the scope of his invitation by approaching the water's edge, its interpretation of the posted warnings and nature of the premises, and its application of the Public Trust Doctrine. Thus, we remain unpersuaded by plaintiffs' argument for reversal.

F.

(The Gross Negligence Claim)

Lastly, we are not persuaded based on the record before us that plaintiffs

31

establish gross negligence on the part of defendants by permitting them access to the beach after warning them not to enter the water.  Gross negligence is "the failure to exercise slight care or diligence." Introductory Notes, Model Jury Charge (Civil) § 5.12 "Gross Negligence" (2025).  Although gross negligence is something more than "inattention" or "mistaken judgment," it does not require willful or wanton misconduct or recklessness.  Model Jury Charge (Civil) § 5.12 "Gross Negligence" (2025).  See also Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 364 (2016).

The New Jersey Civil Model Jury Charge defines gross negligence as

> an act or omission, which is more than ordinary negligence, but less than willful or intentional misconduct.  Gross negligence refers to a person's conduct where an act or failure to act creates an unreasonable risk of harm to another because of the person's failure to exercise slight care or diligence.
>
> [Ibid.]

The model jury charge also conveys that gross negligence is an indifference to another by failing to exercise even scant care or by thoughtless disregard of the consequences that may follow from an act or omission.  See Id.  Here, we conclude plaintiffs fail to raise any genuine factual issues that could establish defendants' actions or omissions were so extreme as to be deemed grossly negligent.

A-0183-24

G.

(Conclusion)

In sum, we conclude the court's grant of summary judgment was proper. Defendants owed no duty to close its beach to the public on the day in question and their signage was admittedly adequate to convey to plaintiffs they were allowed to use the beach but prohibited from swimming. Accordingly, plaintiffs cannot establish a prima facie case of negligence and defendants were entitled to summary judgment in their favor.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

SABATINO, P.J.A.D., concurring.

As explained in Judge Walcott-Henderson's well-reasoned majority opinion, the trial court justifiably granted summary judgment to defendants in this tragic case, albeit not based on immunities they had claimed under the Landowners Liability Act, N.J.S.A. 2A:42A-2 to -10. I write separately to underscore certain points relating to plaintiffs' argument that the signage on defendants' premises was confusing and inadequate to warn patrons of the hazards existing on the day of the fatality.

Our law generally recognizes that, in order to be effective, warnings about potentially dangerous conditions or products ought to be "accurate, clear and unambiguous." Banner v. Hoffman-La Roche, Inc., 383 N.J. Super. 364, 382 (App. Div. 2006). Commercial landowners, such as defendants in this case, may satisfy their duty of care to invitees if there is a dangerous condition on their premises to provide a "reasonable warning of such danger." Rapp v. Pub. Serv. Coordinated Transp., 15 N.J. Super. 305, 312 (App. Div. 1951); see also Kingett v. Miller, 347 N.J. Super. 566, 568 (App. Div. 2002). "Where a warning is given, the warning must render the premises reasonably safe to fulfill [the defendant's] duty." Berrios v. United Parcel Serv., 265 N.J. Super. 436, 442 (Law Div. 1992), aff'd, 265 N.J. Super. 368 (App. Div. 1993). "Implicit in the duty to warn is the duty to warn with a degree of intensity that

would cause a reasonable [person] to exercise for [that person's] own safety the caution commensurate with the potential danger." Black v. Pub. Serv. Elec. & Gas Co., 56 N.J. 63, 85 (1970). Logically, that "degree of intensity" should also be accompanied by a reasonable degree of clarity and accuracy.

The majority opinion describes the warnings that defendants posted on the premises when decedent and his family came onto the beach on September 23, 2020. Ante at 9. The warnings were essentially of two kinds: (1) one or more red flags displayed near the beach; and (2) a sign posted by the beach entrance.[1] As noted above, the sign read as follows:

BEACHES CLOSED
NO SWIMMING

The sign itself provided no further explanation. Moreover, by the time of the family's visit, defendants had removed, after Labor Day, separate signage that explained the meaning of the various color-coded flags.

In his report and at his deposition, plaintiffs' beach operations expert criticized the sign as "confusing," "vague," and not "effective." He further opined that the juxtaposition of the two declarations ("BEACHES CLOSED" and "NO SWIMMING") made it "unclear" whether the beaches were actually closed or not on that particular day. He additionally noted that it was

_____

[1] Although David Timpanaro recalled seeing more than one sign, only one is presented with a photograph in the appellate record.

A-0183-24

uncertain whether the sign was conveying "one entire thought or two separate thoughts."

These are tenable criticisms. If, as we know from the undisputed facts, the beach was <u>not</u> completely closed on September 23, 2020, and that defendants left the gate open to admit patrons onto the sand, then the "BEACHES CLOSED" portion of the sign was literally wrong. In truth, the beach was closed that day only for swimming and wading, as specified in the Standard Operating & Training Manual. The beach was otherwise open for sunbathing, walking, seashell collecting, and other activities by visitors that did not involve submerging themselves into the water.

The second line of the sign ("NO SWIMMING") could further add to a reader's potential uncertainty and confusion. Having just warned on the line above that the beaches were "closed," what meaning does a prohibition on swimming add? One can't swim in the ocean if access (whether "vertical" or "horizontal") to the beaches that adjoin the water has been completely closed. Does the sign's second line signify that visitors can disregard the first line? Does being admitted onto the beach mean that the sign is inoperative that day

A-0183-24

or for that hour? The sign could breed confusion,[2] and thereby endanger the persons it was intended to protect from harm.

To be sure, as defendants and my colleagues rightly note, ante at 23, under the Public Access Doctrine embodied in the DEP permits and the settlement agreement, defendants did not have the right to close off access to the beach unless an enumerated exception for severe foul weather applies. As the majority opinion demonstrates, that exception did not exist here. But visitors would have no reason to know what the terms of those documents specified. What they would know is that a sign by the entrance to the beach is telling them the beaches are "closed," but, at the same time, is instructing them to refrain from swimming if they somehow manage to access those same closed beaches.

To be accurate and consistent, the sign preferably should have said something akin to "BEACHES CLOSED FOR SWIMMING." As is, the sign instead presented an arguably ambiguous message. Plaintiffs' expert therefore presented a plausible contention that the signage failed to meet the law's mandate that a warning be "accurate, clear and unambiguous." Banner, 383 N.J. Super. at 382.

---

[2] "Confusion now hath made his masterpiece." William Shakespeare, Macbeth, act 2, sc. 3.

A-0183-24

Even so, the critical defect in plaintiffs' defective-signage claim is that both David and Lia Timpanaro admitted at their depositions that they understood the beach was open for use except that swimming was disallowed. That understanding was fortified by the beach attendant's oral clarification to the family when they paid their parking fee. There is no reason to believe that decedent, who joined in this family activity, had a contrary impression. In short, the defects in the signage cited by the expert were inconsequential on this record.

Consequently, I concur in our court's decision, but with the caveat that the result here should not be misconstrued as an endorsement of the defendants' mixed-message signage.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division